UNITED STATES of America, Appellee,

v.

Karl "Jack" SCHWARTZBAUM, Defendant-Appellant.

Nos. 9 and 410, Dockets 74–1901 and 75–1337.

United States Court of Appeals, Second Circuit.

Argued Sept. 22, 1975.

Decided Nov. 7, 1975.

Certiorari Denied March 1, 1976. See 96 S.Ct. 1410.

conviction in the Southern District of four officials of the Furriers Joint Council (the Union) for, inter alia, accepting the payment of money from certain employers in violation of 29 U.S.C. § 186(b).[1] In an indictment returned on June 21, 1973, Karl "Jack" Schwartzbaum, a fur manufacturer and appellant herein, was charged with having made four such illicit bribes of $150 each during 1969 and 1970 in an effort to assure union approval for his continuous breach of the collective bargaining agreement, 29 U.S.C. § 186(a).[2] On April 4, 1974, following a four day trial, a jury returned a verdict of guilty on all three counts presented to them.[3] Schwartzbaum has appealed from that conviction and the $1,000 fine imposed for each count, as well as from orders of Judge Pierce dated May 14, 1974, June 24, 1974, June 4, 1975 and June 5, 1975 denying his post-trial motions for a new trial and dismissal of the indictment. We affirm.

Manhattan's fur garment industry, consisting of approximately 600 union manufacturers and 400 non-union firms, is geographically concentrated from 27th to 30th Streets between Sixth and Eighth Avenues. As of 1968, some 350 of the unionized companies, including that owned by appellant, had organized themselves into the Associated Fur Manufacturers (the Association) for purposes of negotiating a joint agreement with the Furriers Joint Council. The work preservation provisions of that agreement, as detailed in our opinion in *Stof-*

V. Thomas Fryman, Jr., Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty. for the Southern District of New York, John C. Sabetta, Asst. U. S. Atty., New York City, on the brief), for appellee.

Henry J. Boitel, New York City (Goldstein, Shames & Hyde, Edward Brodsky, and William Esbitt, New York City, on the brief), for defendant-appellant.

Before LUMBARD, MANSFIELD and TIMBERS, Circuit Judges.

LUMBARD, Circuit Judge:

In *United States v. Stofsky*, 527 F.2d 237, decided today, we affirmed the

---

**1.** 29 U.S.C. § 186(b)(1) provides:

It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

The union leaders convicted thereunder were George Stofsky, Charles Hoff, Al Gold and Clifford Lageoles.

**2.** 29 U.S.C. § 186(a) reads:

It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, advisor, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend or deliver, any money or other thing of value . . . (4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

Sam Sherman, Harry Hessel and Sol Cohen, also fur manufacturers, were indicted along with appellant. Each pleaded guilty to one count of violating 29 U.S.C. § 186(a).

**3.** Schwartzbaum's indictment charged him, in four counts, with having violated 29 U.S.C. § 186(a). However, the last of these counts, dealing with an alleged payment of $150 in 1970, was dismissed with the government's consent at the close of its case.

*sky,* proscribed the "contracting" of work to non-union shops and the purchase of finished fur garments from countries outside the United States. These provisions were and are policed almost exclusively by the Union, which during the relevant period employed seven business agents, each assigned to roughly one hundred small shops, to ferret out contractual violations. Disputes which could not be resolved by informal consultation between the Union and one of several labor adjusters retained by the Association, were referred to a committee headed by an Impartial Chairman. A manufacturer found to have breached the agreement was subject to either fine or strike.

Despite these potential sanctions, K. J. Schwartzbaum, Inc. (KJS) began in 1968 to "contract" part of its work in order to improve what the appellant perceived to be a deteriorating competitive position. By 1970, 25 to 50 percent of the garments sold by the firm were manufactured by outside contractors. The attraction of contracting was that it enabled the employer to avoid the higher salaries and fringe benefits required by the Union contract. To disguise these activities from Union representatives permitted by the agreement to inspect the company's books, Schwartzbaum funnelled all payments to contractors through a special bank account established for that purpose by Murray Bittman, his vice-president.

In addition, Schwartzbaum sought further protection by soliciting the aid of Jack Glasser, Association labor adjuster assigned to his firm. Testifying under a grant of transactional immunity, Glasser stated that he received a telephone call from the appellant in May, 1968, requesting that he come to a meeting at the KJS offices. As recounted by Glasser, Schwartzbaum told him at that meeting that he had been contracting and asked whether there was any way to secure the cooperation of the Union. Glasser, who had previously relayed money from other manufacturers seeking absolution for contracting violations, spoke the following day to Charles Hoff, assistant manager of the Union. Hoff consented to a similar arrangement for Schwartzbaum whereupon Glasser returned to KJS and told the appellant, "I have the okay from Charlie Hoff." Glasser added that over the next two years he received six installments of $300 each from Schwartzbaum and that each time he forwarded one half of that sum to Hoff, identifying the appellant as its source. Throughout those years, KJS operated free from the union "harassment" which Schwartzbaum had feared. Shortly after Glasser's forced departure from the industry, KJS was fined $3,500.

Glasser further testified that he served as a conduit for payments to a second Union official, Harry Jaffee. These payments, not charged in the indictment, became necessary because Jaffee's position as Union business agent for KJS placed him in a unique position to observe its contracting activities. On at least one occasion, Jaffee was taken aside, handed $100 which he was told was from Schwartzbaum, and instructed to ignore any infractions which he might have seen. Jaffee, guaranteed testimonial immunity, confirmed this portion of Glasser's story.

After the return of the original indictment against him on March 27, 1973,[4] and aware that its allegations had been publicized in the local newspapers, Schwartzbaum became concerned about the possible reaction of Chase Manhattan Bank, with whom KJS had $400,000 in outstanding inventory loans. Appellant therefore contacted Albert Chambers, the responsible officer at Chase, and arranged a meeting to discuss his affairs. Chambers testified at trial that at this meeting on April 3, 1973, Schwartzbaum confessed to him that he had made payments to union officials totalling $600 but discounted their magnitude and im-

---

4. The indictment under which appellant was actually tried, 73 Cr. 616, was filed on June 21, 1973, and superseded the earlier indictment filed on March 27, 1973.

portance, suggesting that the reason for his indictment might simply have been to secure his assistance in prosecuting the government's principal targets. He assured Chambers that, in any event, his legal difficulties would have no adverse effect upon the operation of his company.

Schwartzbaum presented no defense to these charges other than the testimony of his wife who placed him in Florida at about the time when Glasser indicated that he had received two of the payments in New York. In contrast to the strategy of the union defendants in *United States v. Stofsky,* whose trial had ended in conviction five weeks earlier, appellant made no attempt to probe Glasser's personal finances in an effort to show that he had retained rather than transmitted any monies paid to him.

## I

In the wake of his conviction, Schwartzbaum made three new trial motions, all of which were denied by Judge Pierce. The first of these contended that the district court committed error in permitting the use of a government prepared memorandum to refresh Glasser's memory and then in refusing appellant's request to examine the Assistant United States Attorney ("AUSA") regarding the document.

As previously indicated, Glasser had testified on direct examination that in his conversations with Schwartzbaum he had specifically identified Charles Hoff as the union official to whom the payoffs were made. He retreated, however, under the pressure of cross-examination and conceded the possibility that he had not done so. On re-direct, the AUSA showed Glasser a summary of an earlier interview with the prosecutors in which Glasser had recalled the use of Hoff's name. His memory thus refreshed, Glasser reaffirmed his original testimony. At this point, appellant's counsel unsuccessfully moved to call the AUSA and question him as to the circumstances under which the summary was written.

The clear but unspoken implication underlying both of Schwartzbaum's claims of error in his first new trial motion, was that in directing Glasser's attention to the memorandum in question, the government's intent was to suggest rather than refresh. We agree with the district court that there is absolutely nothing in the record to support this serious allegation of prosecutorial misconduct. The government's papers in opposition to this motion amply and convincingly elucidated the innocent history of this challenged document. Moreover, appellant's argument overlooks the fact that on direct examination and without the aid of the memorandum, Glasser had given substantially similar testimony on the disputed issue. Judge Pierce did not abuse his discretion in dismissing Schwartzbaum's unsubstantiated suspicions and adhering to the general principle that any writing may be used to refresh the recollection of a witness, even if that writing is not made by the witness himself, Wigmore on Evidence, Vol. III, §§ 758–9.

Nor was any reason shown to permit the defendant to call government counsel as a witness. Such a procedure, inevitably confusing the distinctions between advocate and witness, argument and testimony, is acceptable only if required by a compelling and legitimate need. *United States v. Torres,* 503 F.2d 1120, 1124 (2d Cir. 1974); *United States v. Newman,* 476 F.2d 733 (3d Cir. 1973). Schwartzbaum fell far short of that standard in this case. The use of the memorandum itself would have sufficed to establish inconsistencies between Glasser's in-court statements and those purportedly made extrajudicially. See *United States v. Fiorillo,* 376 F.2d 180 (2d Cir. 1967). Had there been a genuine belief that the memorandum had been fabricated, the proper procedure would have been to request a hearing outside of the jury's presence. No such request was made.

## II

Schwartzbaum's second new trial motion was based upon evidence of Glas-

ser's perjury at the Stofsky trial, uncovered by counsel for Stofsky and raised concurrently as a basis for reversal of the Stofsky convictions.[5] Appellant contends that the belated revelation that Glasser had made large scale cash deposits during the period in which he claims to have served as conduit for illegal payments from employers to union leaders in the fur garment industry suggests an extensive history of illegal dealings from which the jury might well have concluded that Glasser was incapable of recalling or distinguishing the precise substance of his conversations with Schwartzbaum. Appellant also argues that such large accumulations of cash strongly imply that no money was ever delivered to the labor leaders as charged in the indictment and required for conviction under 29 U.S.C. § 186(a).

This "new" information, now deemed so critical, was the product of subpoenas duces tecum served by the Stofsky attorneys on the East New York Savings Bank, the Greenwich Savings Bank and the Emigrant Savings Bank on April 10, 1974, six weeks after the Stofsky trial and one week following appellant's conviction. The existence of Glasser's accounts in each of these banks had been indicated on his 1967–1971 federal income tax returns, copies of which the government had turned over to the Stofsky defense pursuant to court order on February 20, 1974. An examination of Glasser's deposit slips submitted in response to these subpoenas revealed that, contrary to his testimony at the Stofsky trial,[6] Glasser had deposited in his various savings accounts a total of $61,-

659.05, of which approximately $57,000 was in cash.

At the threshold, however, it is well-settled that the burden is upon the movant in a new trial motion to establish that he could not, with due diligence, have discovered the evidence before, or at the latest, at trial. *United States v. Costello*, 255 F.2d 876, 879 (2d Cir.), *cert. denied*, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958). We agree with Judge Pierce that Schwartzbaum failed to satisfy that requirement.

The Stofsky trial had preceded that of appellant by nearly five weeks. We have been informed of no reason, and perceive none ourselves, why during that interim the Schwartzbaum attorneys could not have investigated precisely those same leads later pursued by counsel for Stofsky. Appellant's frequent references to the Stofsky transcript during the course of his own trial indicate that he must have been, or should have been, aware of the fact that Glasser's tax returns had been requested and produced on February 20, 1974.[7] Had he subpoenaed the records of the banks therein noted at any time during the ensuing month, Glasser's deposit slips could have been delivered within two to four business days[8] and in Schwartzbaum's possession well in advance of the beginning of his trial on April 1. Moreover, appellant made no attempt during cross-examination to inquire into the source of Glasser's small fortune.[9] The evidence upon which he now so strongly relies was, at most, only collateral to the factual issues contested at trial.

5. In *United States v. Stofsky*, we have today considered and rejected the claim of the Stofsky defendants.

6. At the Stofsky trial, Glasser and his wife testified that the $120,000 aggregated in his various savings accounts had been derived from an inheritance received by his wife in the early 1940's. It is undisputed that their testimony on this point was perjurious.

7. In fact, counsel for Stofsky affirms that at a meeting in March, 1974, he notified appellant's lawyer that evidence indicating Glasser's cash deposits had been uncovered. However, counsel for Schwartzbaum, who suffers from a hearing impairment, denies any recollection of being so informed. Our conclusion that appellant's attorney should himself have pursued the information contained in Glasser's tax return makes it unnecessary for us to resolve this uncertainty.

8. Officers of the East New York, the Emigrant and the Greenwich savings banks, all submitted affidavits to that effect.

9. This decision may well be explained by the conclusion of Judge Pierce that revelation of widespread corruption in the fur garment industry was more likely to weaken the defense than to strengthen it.

We are unpersuaded by appellant's contention that a jury would likely have deduced from Glasser's $57,000 in cash deposits that the entire $900 which had been given him by Schwartzbaum and for which Schwartzbaum was convicted, had likewise been placed in his personal savings accounts. The disproportion of the figures renders wholly speculative any logical nexus between them. It is true that Glasser's credibility might well have been impeached by exposing to the Schwartzbaum jury his perjury at the earlier Stofsky trial. But, had appellant exercised due diligence in retrieving Glasser's bank records, he could easily have established these inconsistencies at his own trial by a comparison with the Stofsky minutes which he already possessed and frequently referred to.

■ The standard for granting a retrial on the ground of newly discovered evidence is whether that evidence is "of such a nature that it would probably produce a different verdict in the event of a [new trial]." [10] *United States v. DeSapio*, 456 F.2d 644, 647 (2d Cir.), *cert. denied*, 406 U.S. 933, 92 S.Ct. 1776, 32 L.Ed.2d 135 (1972).

■ The government presented persuasive evidence of Schwartzbaum's guilt. Chambers testified as to Schwartzbaum's confession to him and Jaffee admitted the receipt of monies which Glasser told him were being relayed from the appellant. Furthermore, Schwartzbaum's firm operated free of Union harassment during the period in which Glasser was operating as a bagman but was fined $3,500 almost immediately following his departure from the industry. Viewing all the evidence, we agree with Judge Pierce that there is little likelihood that the jury's verdict would have been affected by disclosure of Glasser's prior perjury and his previously concealed deposits.

## III

■ Schwartzbaum's third new trial motion, also paralleling an identical motion raised by the Stofsky defendants, was based upon the prosecution's tardy disclosure that the full extent of Glasser's deposits totalled $157,000 between 1962 and 1970, somewhat more than the approximately $61,000 between 1967 and 1970 earlier indicated. This information was uncovered during the pendency of appellant's second new trial motion as a result of the government's continuing investigation into Glasser's personal finances. Nevertheless, the government unilaterally decided to withhold this discovery until the completion of their investigation. It was not until September 12, 1974, after Schwartzbaum's second new trial motion had been denied and his notice of appeal filed, that the United States Attorney, sua sponte, sent a letter to appellant's counsel notifying him of Glasser's additional deposits. By stipulation, the appeal was then stayed pending the resolution in the district court of Schwartzbaum's third new trial motion.

This latest motion differed from the second only in the increased magnitude of Glasser's deposits; the theories by which appellant argues he might have exploited this new evidence remain the same. We concur in Judge Pierce's conclusion that the strong case against Schwartzbaum would probably not have been affected by these newest revelations. "Whether Glasser had secreted $58,000 or $157,000 dollars in his checking and savings accounts would . . . have little significance at a new trial."

In the absence of any evidence that the government was guilty of bad faith in delaying the relinquishment of Glasser's financial record,[11] there is no need for a hearing to inquire into prosecutorial misconduct, as Schwartzbaum now

---

10. An extensive discussion of the applicable standard for reviewing and granting new trial motions is contained in our opinion in *United States v. Stofsky.*

11. To the contrary, the actions of the prosecution in turning over the records and agreeing to a stay of Glasser's pending appeal, indicate a good faith desire to cooperate with the defense.

contends. Schwartzbaum was permitted to make a third new trial motion and thus suffered no prejudice from the delay in being furnished the additional evidence of Glasser's savings bank deposits. *United States v. Rosner*, 516 F.2d 269 (2d Cir. 1975).

### IV

As fully elaborated in our opinion in *Stofsky*, we find no merit in appellant's remaining attack upon the legal sufficiency of the indictment under which he was tried and convicted. We hold that the grand jury which returned the superseding indictment against him in the twenty-seventh month of its existence had been properly impanelled and its life validly extended under the provisions of the Organized Crime Control Act of 1970, 18 U.S.C. § 3331. Schwartzbaum's contention that the Strike Force Attorney who presented the case to that grand jury lacked adequate authorization has already been rejected by us. *See e. g. In re Grand Jury Subpoena of Alphonse Persico*, 522 F.2d 41 (2d Cir. 1975).

Affirmed.