**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Paul SOLINA and Ronnie Bruscino,**
**Defendants-Appellants.**

**Nos. 83–1200, 83–1232.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 8, 1983.

Decided April 27, 1984.

Rehearing Denied May 31, 1984.

As Amended on Denial of
Rehearing and Rehearing En Banc
June 13, 1984.

Robert C. Babione, St. Louis, Mo., Mary M. Runnells, Bloomfield, Ind., for defendants-appellants.

Robert T. Coleman, Asst. U.S. Atty., Frederick J. Hess, U.S. Atty., East St. Louis, for plaintiff-appellee.

Before PELL, POSNER and COFFEY, Circuit Judges.

POSNER, Circuit Judge.

Solina and Bruscino, two inmates at Marion Federal Penitentiary, appeal from their convictions for assaulting a guard, Carter, during a free-for-all in the prison mess. Carter had just taken a knife away from

another inmate when (according to the government's evidence) Solina tackled him and Bruscino hit him with a chair. Solina and Bruscino were tried together, convicted by a jury, and sentenced to three and eight years' imprisonment, respectively, to run consecutively to their other federal sentences.

Their appeals raise a number of different issues, which we discuss in the sequence in which they arose in the prosecutions. One issue, however—the defendants' challenge to the selection of the jury—need not be discussed; the identical issue was resolved in the government's favor in our recent en banc decision in *United States v. Gometz*, 730 F.2d 475 (7th Cir.1984).

■ The first two issues we take up relate to the district judge's refusal to grant continuances to give the defendants more time to get ready for trial. The fight in the mess took place on April 16, 1982, the indictment was handed down on November 18, 1982, and the trial began on January 3, 1983. Bruscino was represented by appointed counsel from the public defender's office and does not contend that his appointed counsel was incompetent or ineffective. But just before the trial began Bruscino succeeded in retaining counsel, and on the day the trial began, his retained counsel, though he had not yet filed an appearance, moved for a continuance to enable him to familiarize himself with the case. The district judge refused to grant the continuance. We think the judge acted within his discretion. Bruscino had had more than eight months after the incident (and five weeks after the indictment) to retain counsel, and the timing of the request for a continuance suggests that he may deliberately have waited till the last moment in order to delay the trial. In any event that would have been the effect of granting the continuance, and the delay would have caused inconvenience to the judge, the jurors, and the prosecutors, and to other litigants in the district court, whose trials might have had to be rescheduled. It is true that as a result of the judge's denial of the continuance Bruscino's retained counsel withdrew from the case and Bruscino went to trial without the counsel of his choice. But he had competent counsel; and while a court may not arbitrarily deny a criminal defendant the right to retain his own counsel in preference to being defended free of charge by a lawyer appointed by the court, it is not required to allow a last-minute change in counsel to disrupt its schedule. *Morris v. Slappy*, 461 U.S. 1, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983); *Skillern v. Estelle*, 720 F.2d 839, 850–51 (5th Cir.1983); *United States v. Cicale*, 691 F.2d 95, 106–07 (2d Cir.1982).

■ Without going so far as to suggest that his appointed counsel was incompetent, Bruscino argues that a certain antagonism developed between counsel and court during the course of trial, which (he suggests) would not have happened with the counsel of his choice. This may be; but if as we believe the refusal to allow a last-minute substitution of counsel did not violate Bruscino's rights, the fact that he might have done better at trial if the substitution had been allowed has no legal significance. See *United States v. Ely*, 719 F.2d 902, 904–05 (7th Cir.1983); cf. *Ford v. Israel*, 701 F.2d 689, 693 (7th Cir. 1983). It would be different if his appointed counsel had had a conflict of interest or had otherwise been incapable of representing him effectively, but as we have said nothing of that sort is suggested.

■■ Solina made clear at his arraignment a month before trial that he wanted to defend himself. "Standby counsel" was appointed to assist Solina with any points of law that might arise at trial. On the day trial began, Solina asked the court to let his standby counsel take over and conduct his defense, and standby counsel asked for a continuance in order to prepare. The judge refused the continuance, and again we think he was acting within his discretion in doing so. A criminal defendant has a constitutional right to defend himself; and with rights come responsibilities. If at the last minute he gets cold feet and wants a lawyer to defend him he runs the risk that

the judge will hold him to his original decision in order to avoid the disruption of the court's schedule that a continuance granted on the very day that trial is scheduled to begin is bound to cause.

■ Both defendants have previous experience with the criminal justice system. That both should have moved for continuances on the opening day of trial suggested to the district judge, who has long experience with litigation out of Marion—the nation's maximum-security federal prison (successor to Alcatraz), see *Garza v. Miller*, 688 F.2d 480, 482 (7th Cir.1982)—that these last-minute changes of mind were intended to delay the trial. We are inclined to defer to his intuition but in any event believe that the scheduling problems the continuances would have caused were in themselves sufficient ground for refusing to delay the trial, in the absence of any showing that either Bruscino's appointed counsel or Solina (assisted by standby counsel) were incapable of conducting an adequate defense.

■ The next set of issues we discuss are evidentiary. The defendants wanted to put into evidence the torn and bloody clothing of several inmates who had been wounded by Logue, the knife wielder whom Carter, the victim of the defendants' assaults, disarmed. The government could not produce the clothing, which apparently had been lost. There is no indication that the government deliberately suppressed this evidence, but the defendants argue that they should at least have been allowed to present evidence that the clothing had been lost, and the district judge refused to let them do so. We think he acted properly. The torn and bloody clothing had no relevance to the defendants' case. If anything, its introduction into evidence (if it had been found) would have bolstered the government's case by showing what a menace Logue had been, thus making it all the more reprehensible that Solina and Bruscino should have assaulted the guard who disarmed him. Especially if the defendants' action could be taken to imply that they were in league with Logue, the pro-

duction of physical evidence of the damage he had done with his knife could only have harmed their cause.

■ A related objection is to the exclusion of testimony by an inmate who allegedly heard Carter, before the altercation with Solina and Bruscino, announce that he had secured Logue's knife. This evidence was excluded as hearsay. The basis of exclusion was incorrect. The evidence was offered to show not the truth of Carter's statement but the state of mind of the defendants, who testified that they had acted in self-defense. Nevertheless, the evidence was properly excluded; it was irrelevant. If the defendants knew that Carter had just disarmed a dangerous knife-wielding assailant, it is all the more difficult to understand why they should have attacked Carter and how they could have thought they were acting in self-defense in doing so.

■ The defendants also object to the exclusion of some photographs. Several were admitted; the ones that were excluded were additional photographs of the mess hall after the fight, and of two of the inmates who had been cut up by Logue. The additional photographs of the mess hall were duplicative. The photographs of the wounded inmates were irrelevant on the same ground that the torn and bloody clothing would have been irrelevant—as well as gruesome.

■ Bruscino complains about the district court's refusal to allow him to subpoena a guard from the federal prison at Terre Haute in order to give testimony—of a rather improbable cast, see *United States v. Bruscino*, 662 F.2d 450, 452–53 (1981), modified on other grounds, 687 F.2d 938 (7th Cir.1982) (en banc)—concerning Bruscino's pacific character. Fed.R.Crim.P. 17(b) directs the district court to subpoena on behalf of an indigent criminal defendant a witness whose "presence is necessary to an adequate defense." Where as in this case the presence of a witness is being sought in order that he may give highly implausible and by no means essen-

tial character evidence, the court's refusal to subpoena the witness is not a violation of the rule and plainly not a basis for finding reversible error. Cf. *United States v. Garza*, 664 F.2d 135, 141 (7th Cir.1981). Our resolution of this issue also meets Bruscino's argument that the court, in scheduling the trial only 34 days after the arraignments, did not give him enough time to get ready. His only example of why he needed more time was to get his character witness from Terre Haute.

The defendants challenge the judge's order limiting the number of witnesses that each of them could call to four (not counting themselves). Actually the judge later changed the limit to allow Solina seven witnesses (besides himself). Bruscino used up his quota, but Solina did not, and as to him therefore the issue of the limit on the number of witnesses is academic. So we shall confine our discussion to Bruscino. As he points out, the critical question in the case was what had happened during the fight, and all the inmates who had been present—some 40 or 50—were potential eyewitnesses. However, judges must have the power to limit the number of witnesses that a party can present at trial, or else some trials would go on forever. The power was not abused here. See *Loux v. United States*, 389 F.2d 911, 917 (9th Cir.1968), a case very similar to this one. Bruscino is unable to show what benefit he would have obtained from having additional inmates step forward and corroborate the version of the fight to which the defendants themselves testified. Apparently the evidence of the additional witnesses would have been entirely repetitive, for the defendants made no offers of proof that suggest otherwise, nor did they offer to put before the jury in a stipulation the evidence that the additional inmate witnesses would have given. It is true that even repetitive evidence might have had some value in bolstering the credibility of the defendants' version of the fight, though juries are always cautioned not to resolve factual disputes simply by counting the number of witnesses on each side of the dispute. (Also, inmates are not highly credible witnesses; but it is unclear whether this makes it more or less important to a defendant to be supported by additional inmate witnesses.) But especially as it is well known that inmates regard testifying in court as a lark, an outing, a break from prison routine, district judges must be allowed a reasonable latitude in limiting the number of such witnesses; and we do not think that latitude was exceeded here.

The defendants raise some other evidentiary issues, but they are not worth discussing, and we move on to their argument that the prosecutor made improper remarks in closing argument. The first remark was: "Of course they don't have to put on any evidence in their defense, but ladies and gentlemen when they put on evidence, they have to be judged by the believability of what they put on. And if that evidence is not believable, they have to rise or fall by the believability of that evidence." The defendants argue that in so saying the prosecutor implied that the burden of proof was on the defendants, rather than the government, once they elected to offer evidence. This is a strained interpretation of remarks seemingly intended just to tell the jury that it was not obliged to believe the defendants' witnesses. In any event, the jury was instructed not once but several times that the prosecution had the burden of proving the defendants' guilt beyond a reasonable doubt. The instructions (delivered of course after the closing arguments) should have cured whatever misapprehension the prosecutor's remark may have created.

Bruscino also complains about the prosecutor's remarks in closing argument about inmate Garza, who had testified on Bruscino's behalf that it was he, Garza, not Bruscino, who had hit Carter with the chair. The prosecutor said: "Mr. Garnati [Bruscino's counsel] says [Garza] doesn't have any motive to lie here today; that he could be indicted. Well, Mr. Garnati knows and you should know, ladies and gentlemen, this little scenario happens at the next trial, he was coerced by someone,

unknown, and that statement wouldn't be admissible .... What a great situation that would be when that happens. The statement can't come in at Garza's trial ...." Bruscino argues that these remarks went beyond the evidence, since there was no evidence that Garza had been coerced to testify. But this misses the thrust of the remarks. The prosecutor was arguing that if Bruscino was acquitted and Garza indicted in his place, Garza would argue that his testimony in Bruscino's trial had been coerced, and if this argument was accepted the testimony would be inadmissible and Garza would have to be acquitted too. All this was conjecture but it was within the bounds of fair reply to the argument of Bruscino's counsel that Garza had no motive to lie because if Bruscino was acquitted Garza would be indicted. That inmates at Marion are occasionally coerced by other inmates is an unfortunate fact of life of which we can take judicial notice, see, e.g., *United States v. Silverstein*, 732 F.2d 1338 (7th Cir.1984); *United States v. Fountain*, 642 F.2d 1083, 1085–86 (7th Cir.1981); *Ali v. Gibson*, 483 F.Supp. 1102, 1116–17 (D.V.I.1979), rev'd on other grounds, 631 F.2d 1126 (3d Cir.1980), and which makes it quite likely that if Garza were indicted on the basis of his testimony on behalf of Bruscino he would indeed argue that the testimony had been coerced by Bruscino, who at the time of trial had recently been convicted of murdering another inmate. See *United States v. Bruscino, supra.* That is all the prosecutor said, and it was no more than the truth.

The defendants argue that in the copy of the indictment given the jury when it retired for its deliberations the phrases "the grand jury charges" and "a true bill" should have been deleted, along with the signatures of the foreman of the grand jury and the United States Attorney. Except in regard to the phrase, "a true bill," we find the argument difficult to understand. The phrase, "the grand jury charges," merely reinforced the instruction that the judge gave the jury, along with the indictment, that the indictment was a summary of charges and not evidence of the defendants' guilt. We think the phrase "a true bill" should have been deleted, as the jury might not understand that the word "true" referred to the authenticity of the indictment rather than to the truth of the charges contained in it. But since as we have said the jury was instructed that the indictment was not evidence, the failure to delete the phrase was not so prejudicial as to warrant reversal, see *United States v. Ramirez*, 710 F.2d 535, 545 (9th Cir. 1983), especially since neither defendant moved to have the phrase deleted before the indictment was sent to the jury.

The district court refused to give an instruction requested by Solina that he should be acquitted unless the jury found beyond a reasonable doubt that his assault on Carter "was not an instinctive reaction." Apart from the objection to giving instructions that contain a double negative and are therefore confusing, the instruction was hopelessly ambiguous and assuredly should not have been given. The word "instinct" is used in our language in two quite different senses. The first is the scientific sense in which an "instinctive reaction" is an involuntary reflex based not on culture or training but on the genes. When a person who has never been in a high place recoils from heights, his reaction is instinctive in this sense. The second meaning of "instinctive reaction," popular rather than scientific, is a reaction that while not genetically determined occurs too quickly for conscious thought. When a pilot through long training reacts to an emergency by pushing the right buttons without thinking, his reaction is "instinctive" only in the second sense; it is a product of the pilot's training, not of his genetic makeup. Instinct in the first sense, to the extent to which it might be involved in this case, was covered by the judge's instruction (not objected to—in fact proposed by Solina) on self-defense. Instinct in the second sense is not a defense to a criminal charge. If you have been trained to react violently to a variety of culturally inappropriate stimuli (e.g., to someone's frowning at you), and do so

without thought—if you are a "habitual killer"—you are not thereby exonerated from criminal liability. Willfulness does not require an interval of conscious thought. In any event the jury was instructed correctly on the required willfulness of Solina's act, and the additional instruction he requested could only have confused the jury.

The judgments of conviction are AFFIRMED.