UNITED STATES of America

v.

John GOTTI and Frank Locascio,
Defendants.

No. 90 CR 1051 (S–1) (ILG).

United States District Court,
E.D. New York.

Jan. 21, 1992.

Andrew J. Maloney, U.S. Atty., E.D.N.Y., John Gleeson, Asst. U.S. Atty., Brooklyn, N.Y., for U.S.

Albert J. Krieger, Miami, Fla., for John Gotti.

David Greenfield, John W. Mitchell, La-Rossa, Mitchell & Ross, George L. Santangelo, New York City, for Frank Locascio.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

The government has moved this court for an order disqualifying George Santangelo from representing any of the defendants in this case at trial. This motion, like the motion previously made to disqualify Gerald Shargel, Bruce Cutler and John Pollok, is based upon the assertion that counsel's continued participation would give rise to conflicts of interest which cannot be waived or remedied save by an order of disqualification. Defendants have cross-moved for an order disqualifying Assistant United States Attorney John Gleeson from prosecuting this case on behalf of the government.

I

*The Government's Motion to Disqualify George Santangelo*

The government predicates its motion on the assertion that Santangelo's "presence at counsel table would needlessly deprive the government of a fair trial, create a conflict of interest that cannot be waived or remedied by measures other than disqualification, and compromise the integrity of these proceedings by fostering an appearance of impropriety." Government's Memorandum in Support of Motion to Disqualify George Santangelo (Gov't Mem.) at 1.

A chronological synopsis of counsel appearances on behalf of defendant Frank Locascio is helpful. Locascio was arraigned on December 12, 1990, at which time he was represented by David S. Greenfield. Greenfield remained as sole counsel to Locascio until September 1991, when John W. Mitchell (of the law firm LaRossa, Mitchell

& Ross) entered an appearance as co-counsel. The government promptly raised questions regarding Mitchell's participation in this case in view of his knowledge that one of his law partners, James LaRossa, will be called by the government to testify at trial.

On November 12, 1991, Greenfield stated in a letter to the court "that with your Honor's permission, as of November 12, 1991 I am respectfully withdrawing as trial counsel to Mr. Frank Locascio...." This court never granted Greenfield permission to withdraw, however; rather, the court advised him at a subsequent court appearance that he would not be permitted to withdraw given the ethical considerations confronting Mitchell. That Greenfield alone has represented Locascio throughout countless pretrial proceedings and court appearances—and that he was fully conversant with his client's case and was prepared to proceed to trial as far back as August 28, 1991—is beyond cavil. On that date, he informed the court of his readiness to commence trial on Locascio's behalf on September 23, 1991.

On October 3, 1991, the court advised all parties that the trial of this case would begin with jury selection on January 20, 1992. The parties and the court were unaware at the time that the Martin Luther King, Jr. federal holiday fell on that date; subsequently, trial was rescheduled for January 21.

On January 6, 1992, fifteen days prior to jury selection, George Santangelo entered his appearance as co-counsel to Locascio. Three days thereafter, Mitchell advised that he would not present any portion of Locascio's defense. Transcript of Proceedings of January 9, 1992 at 2. At that hearing, Assistant United States Attorney John Gleeson stated that after reviewing the prosecution's anticipated trial proof during the preceding three days, he had asked Santangelo to discuss with him the government's basis for believing that Santangelo should not have entered the case. Gleeson also stated that a motion to disqualify would follow should Santangelo refuse to withdraw. That motion was filed on January 15, 1992.

The court has had occasion in the recent past to review the mandate of the sixth amendment to the Constitution that "[i]n all criminal prosecutions, the accused shall ... have the Assistance of Counsel for his defence." The court has also had occasion, in the course of this case, to review the relationship between that mandate and a motion to disqualify counsel, *see United States v. Gotti*, 771 F.Supp. 552 (E.D.N.Y. 1991), and is mindful of the sensitive concerns, discussed in detail in *Gotti*, to which a motion such as this gives rise. It is with an acute consciousness of those concerns that this motion is addressed.

■ A review of the government's proffer yields two bases upon which a motion for disqualification may be predicated: 1) that Santangelo is answerable to defendant John Gotti, the alleged leader of the Gambino Family—the "enterprise" on which counts 1 and 2 of the indictment are bottomed; and 2) that Santangelo's presence at this trial would offend DR 5–102 of the Model Code of Professional Responsibility.

### A. Santangelo's Connection to Counts 1 and 2

The government contends that Santangelo is "house counsel to the Gambino Family." Gov't Mem. at 2, 8. In addressing the motion, the court shall use the phrase "answerable to Gotti" rather than "house counsel". The difference is purely semantic: in either case, the pernicious effect upon the institutional interest in the rendition of just criminal verdicts is the same, whether Santangelo is the recipient of "benefactor payments" (an allegation not vigorously advanced by the prosecution) or whether he simply answers to Gotti rather than to Locascio.

Evidence of Santangelo's subservience to Gotti would be relevant to establishing that Gotti is the head of an "enterprise" as that term is used in the RICO statute. *See, e.g., United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981). The evidence the government proffers in support of its claim is the testi-

mony it represents will be given by Salvatore Gravano as well as the tape recordings of conversations intercepted through authorized electronic surveillance.

### 1. Salvatore Gravano's proffered testimony

Gravano was one of the four defendants initially named in the indictment, along with Gotti, Locascio, and Thomas Gambino.[1] The indictment charged Gravano with becoming the *consigliere* (counselor) of the Gambino Family following the incarceration of Joseph N. Gallo on May 30, 1989.

Gravano has now chosen to cooperate with the prosecution. The government states that Gravano will testify that shortly after the defendants were arraigned, Gotti told Gravano that he (Gotti) would assign Santangelo to represent either Gravano or Locascio. Gov't Mem. at 9. Such an "assignment" of counsel by Gotti for his codefendant would clearly be probative of the existence of the charged RICO enterprise. *Cf. United States v. Simmons*, 923 F.2d 934, 939 (2d Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 2018, 114 L.Ed.2d 104 and — U.S. ——, 112 S.Ct. 383, 116 L.Ed.2d 334 (1991); *In re Grand Jury Subpoena Served Upon John Doe*, 781 F.2d 238, 251 (2d Cir.1985) (en banc), *cert. denied*, 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986); *Gotti*, 771 F.Supp. at 560.

That it mattered little which defendant Santangelo would represent—that, in effect, the clients were fungible—may be readily inferred by the jury from excerpts of intercepted conversations in which Gotti is heard to decree that lawyers (both his and others') work within certain parameters prescribed by him, and that their concern must be not only for their ostensible clients but for others in the Gambino Fami-

ly as well. *See, e.g., United States v. Gotti*, 771 F.Supp. at 558. Gravano will further testify that Gotti's insistence that lawyers representing the Family march in lock-step contributed to his own decision to cooperate with the government. Evidence of Santangelo's eleventh-hour appearance may warrant the jury to believe that Gravano's testimony in this regard rings true.

The prosecution lists a number of cases in which Santangelo represented either Gotti or persons whom the government alleges are affiliated with the Gambino Family.[2] Referring to a similar list in an earlier opinion in this case, 771 F.Supp. at 561, this court noted the statement of the court in *Simmons* that "the fact that a lawyer has multiple clients in no way implies a connection between them." 923 F.2d at 949. The *Simmons* court went on to say, however, that it made that observation "under circumstances in which there was no other evidence of a criminal association between the attorney's clients." *Id.*

### 2. The intercepted conversations

The government contends that there is other evidence from which a jury could readily conclude that a criminal association exists between Santangelo's clients and Gotti, and that Gotti is the final arbiter of Santangelo's decisions. Accompanying the government's motion is a transcript[3] of a lawfully intercepted conversation from April 18, 1990 among Gotti, Bruce Cutler, and others.

Having reviewed the tape of that conversation (and having compared it with the government's transcript), the court finds that the conversation pertains primarily to the then-pending civil RICO case *United States v. Local 1804–1* referred to above. Gotti, a named defendant in that case, was

---

**1.** Gambino's trial has since been severed from these proceedings.

**2.** In *United States v. Ruggiero*, No. 83 CR 412 (E.D.N.Y.1983), Santangelo, together with Gerald Shargel and John Pollok, represented John Carneglia. In *People v. Gotti*, No. 358/89 (N.Y.Sup.Ct.1989), Santangelo and Cutler jointly represented John Gotti. In *United States v. Gotti*, No. 85 CR 178 (EHN) (E.D.N.Y.1985), Santan-

gelo represented Nicholas Corozzo. In *United States v. Local 1804–1, International Longshoremen's Association*, No. 90 CV 963 (LBS) (S.D.N.Y.1990), Santangelo represented Anthony Ciccone and Anthony Pimpinella.

**3.** Exhibit A to the Affidavit of Assistant United States Attorney James Orenstein in Support of the Government's Motion to Disqualify, referred to as "Tr."

represented by Cutler and the firm of Hoffman & Pollok. Santangelo represented Anthony Ciccone (whom the government describes as a Gambino Family captain), Anthony Pimpinella (characterized as a Gambino soldier), and John Potter, a union official.

The essence of the relevant portion of the conversation is Gotti's insistence upon knowing about, and ultimately approving of, all legal activity in the case not only on his own behalf, but also on behalf of others. Gotti ordains the response the attorneys must make to government assertions of the existence of a Mafia, a Cosa Nostra, or a Gambino Crime Family: there are to be no concessions, and there is to be no finger-pointing. (Tr. 3) Cutler acknowledges his compliance with Gotti's edicts in this regard, assuring Gotti that he met with the lawyers "three times to tell them your credo in life.... But I made them understand: no concessions, everything is denied, everything is fought down to the wire." (Tr. 7)

In an elaboration on his "credo," Gotti is heard to suggest to Cutler that "there ain't nothing" on the tapes as far as he is concerned, and "if there is, it's a mystery to me, I know nothing.... Maybe ... talk to myself a little when I'm talking on that tape." (Tr. 27–28) After commenting unfavorably about a portion of a brief which he demands to have deleted, Gotti goes on to say:

> Yeah, but you see, Bruce, these things I gotta see before we submit. How many times we gotta go through this ... you know what I mean? How many times we gonna go through this? I don't want nothin' submitted.... (Tr. 6)

During a discussion in which Cutler attempts to explain the "legalese" of a particular brief, Gotti says: "But I don't want it. Since when have I agreed to that?" (Tr. 9) The conversation then proceeds as follows:

CUTLER: In other words, you and your friends are friends. It's not the Mafia, it's not the Gambino Family, it's not anything. That's what he means, it's not in your language, it's not written

strong enough. I agree with it. I agree with you. I agree with you.

GOTTI: Okay, but here's what I'm saying.

CUTLER: It's not a concession.

GOTTI: Listen to me. Anything that's put in on my behalf, I wanna see it first, anyway. Who the fuck is he to take a liberty? (Tr. 9–10)

\* \* \* \* \* \*

CUTLER: ... what I told him in the meeting is, John, when you write this, if you ever say anything about anything like the Mafia, whatever the hell it is ... you say "the government says it," not us say it.

GOTTI: And I say "No!" No matter what the fucking tape says, I didn't say anything.

CUTLER: I understand that.

GOTTI: That's what I wanna read! (Tr. 13)

Shortly thereafter, Gotti declares, "I don't want nothin' put in that they send out unless I love it and see it. I wanna see it. I don't give a fuck what anybody else feels." (Tr. 16) As the preceding excerpt indicates, Gotti insists on exerting equally absolute control over the submissions of attorneys representing not him but his associates:

GOTTI: I wanna, I wanna see that,—

CUTLER: From now on—

GOTTI: —not gonna be one word in that I don't see.

CUTLER: You got it, John.

GOTTI: You understand?

CUTLER: You got it, you got it.

GOTTI: And that goes for either George and them, you know what I mean. I'm involved in this.... (Tr. 18)

In discussing Gotti's obdurate insistence upon seeing all submissions, Cutler advises Gotti that he hasn't yet seen a particular brief by Santangelo. When Gotti upbraids Cutler for this oversight, the following exchange ensues:

CUTLER: ... But with George, Johnny, it's different. With George Santangelo, I never even have to worry. I bet there's not even the slightest iota of a

phrase like he says, you understand. With George, I mean, with John Pollok, I have to be more vigilant, and you're a thousand percent right. And I will....

GOTTI: You tell them anything with my fucking meter—

CUTLER: I will.

GOTTI: —or anything that touches me even in perimeter, I wanna see it first. (Tr. 23)

\* \* \* \* \* \*

CUTLER: John, and I'm, and I'm not putting George in this category because George is not that way. But a majority of these lawyers, who you look at, are known as erudite, professorial, ah, egghead types. Will not put in the brief words to the effect "Go fuck yourself!" I know you can't do that. But they will not put in a brief "and we dispute the existence of the Mafia." I say it all the time. They won't write it down, they just won't write it down.

GOTTI: So don't let them do our work then. Don't do my fuckin' work! (Tr. 24–25)

Gotti's adamant stand on seeing everything that relates to him directly, or that is being done on his "meter", supports an inference that Gotti is the benefactor paying for the legal representation of others. Because it is fairly clear that the April 18 conversation relates to the civil RICO case in which Santangelo represented others, an inference that Gotti paid Santangelo's fee would advance the government's assertion that Santangelo is "house counsel" to the Gambino Family.

To the extent that a jury may conclude that Santangelo is "house counsel" to the Gambino Family and is answerable to Gotti, the proffered testimony of Gravano and the tape-recorded conversations are immediately probative of one of the elements necessary to the first two counts of the indictment in this case. Thus, Santangelo's relationship to Gotti and to Gotti's associates is properly the object of proof by the government in its case in chief. But, as with Cutler, Shargel, and Pollok, Santange-lo cannot present himself as counsel for the defendants when his relationship to those defendants is itself an issue under the consideration of the jury. His presence at counsel table could readily serve as a signal to the jury that the court discounts the government's proof on this point—that the court does not believe this evidence. Moreover, Santangelo could not argue against the existence of the charged RICO enterprise without becoming an unsworn witness. *See Gotti*, 771 F.Supp. at 563 (quoting *United States v. Melo*, 702 F.Supp. 939, 943 (D.Mass.1988)).

## B. DR 5–102 of the Model Code of Professional Responsibility

Disciplinary Rule 5–102(A) reads in pertinent part:

If, after undertaking employment in ... pending litigation, a lawyer learns or it is obvious that he ... ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial....

It has often been noted that the Model Code of Professional Responsibility, although lacking the force of statute, provides guidance on the standard of conduct lawyers should observe. *See Armstrong v. McAlpin*, 625 F.2d 433, 446 n. 26 (2d Cir. 1980) (en banc), *vacated on other grounds*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981); *United States v. Wallert*, 733 F.Supp. 570, 572 (E.D.N.Y.1990), *aff'd without op.*, 935 F.2d 1278 (2d Cir.1991). That guidance is directed primarily to the attorney; it

points the way to the aspiring and provides standards by which to judge the transgressor. Each lawyer must find within his own conscience the touchstone against which to test the extent to which his actions should rise above minimum standards. But in the last analysis it is the desire for the respect and confidence of the members of the profession and of the society which he serves that should provide to a lawyer the incentive for the highest possible degree of ethical conduct. The possible loss of that respect and confidence is the ultimate sanction.

So long as its practitioners are guided by these principles, the law will continue to be a noble profession. This is its greatness and its strength, which permit of no compromise.

Model Code of Professional Responsibility Preamble (1980). The Supreme Judicial Court of Massachusetts offers a valuable elaboration of these principles:

We therefore take this opportunity to state that first and foremost, the code is self-executing. We expect lawyers to know and comply with its provisions. If an attorney is unsure whether in a given case his conduct violates the code, he should terminate the questionable conduct or seek the advice of the appropriate Committee on Ethics and Professional Responsibility. If he persists in questionable conduct, he risks disciplinary action including disbarment. When a lawyer, exercising his best judgment, determines that his employment will not bring him into conflict with the code, disqualification may occur only if the trial court determines that his continued participation as counsel taints the legal system or the trial of the cause before it.

*Borman v. Borman*, 378 Mass. 775, 393 N.E.2d 847, 856 (1979).

In view of these clarion calls to professionalism and to the observance of ethical standards, and in light of the plain import of DR 5–102(A), Santangelo should not have undertaken to represent Locascio in this case when he became aware, whether at the outset or shortly thereafter, that he ought to be called as a witness on his client's behalf in response to the government proof regarding the existence of a RICO enterprise. Indeed, the fact that Santangelo may be called as a witness raises the selfsame issues that compelled the earlier disqualifications in this case. *See Gotti*, 771 F.Supp. at 562. On this point, "[t]he Second Circuit rule is clear: when a lawyer possesses evidence that ought to be used to rebut the government's case in chief, DR 5–102(A) *requires* disqualification, even in criminal cases." *United States v. Castellano*, 610 F.Supp. 1151, 1162 (S.D.N.Y.1985) (emphasis added). Because, then, Santangelo ought to be called

as a witness to rebut the government's proof as to the existence of the charged RICO enterprise, DR 5–102(A) requires his disqualification.

As the Supreme Court has observed, the Model Code imposes a duty upon the court as well:

Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.

*Wheat v. United States*, 486 U.S. 153, 160, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988).

Rather than burden this opinion further by restating the principles controlling the disposition of the previous motion to disqualify, this court refers to *United States v. Gotti*, 771 F.Supp. 552 (E.D.N.Y.1991) as embodying those dictates. While respectful of Locascio's sixth amendment rights, the court is also aware of the limitations of that right. In particular, two observations from *Wheat* spring to mind: "When a defendant's selection of counsel, under the particular facts and circumstances of a case, gravely imperils the prospect of a fair trial, a trial court may justifiably refuse to accede to the choice." 486 U.S. at 166, 108 S.Ct. at 1700 (Marshall, J., dissenting). As the majority opinion itself concluded, "The District Court must recognize a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case must be left primarily to the informed judgment of the trial court." *Id.* at 164, 108 S.Ct. at 1700.

This court is keenly aware of its obligation to balance Locascio's right to counsel against the integrity of the trial process, to consider alternatives less drastic than disqualification, and to make specific findings where disqualification is compelled by potential conflict. *See Gotti*, 771 F.Supp. at 566. Having made those findings—and concluding that the conflict between Santangelo's duty to his nominal

client and to Gotti and the Gambino Family is real rather than potential—the court concludes that the government's motion must be granted.

## C. Matters Concerning Mitchell and Greenfield

The defendants have suggested that this court is in part responsible for the late decision by Mitchell not to participate in the presentation of Locascio's defense to the jury—and, by extension, for the late entry of Santangelo into this case. The defendants point out that Mitchell first entered his appearance for Locascio on September 23, 1991, and that the government first challenged the ethical propriety of Mitchell's representation on September 30, 1991. The defendants state that this court indicated on October 3, 1991 that it intended to issue an order regarding Mitchell's participation in this case but that the court did not indicate its decision until a telephone conference on December 30, 1991— at which time the court informed Mitchell that the court intended to allow Mitchell himself to determine his own compliance with the relevant ethical rules but that the court would disqualify Mitchell if it became clear at trial that he had not so complied. From this sequence of events, the defendants argue that the court left "unresolved" for too long the challenge by the government to Mitchell's representation of Locascio; for this reason, they argue, Locascio's "anxiety over the status of [Mitchell] ... continued to increase." Memorandum in Opposition (Opp.Mem.) at 7. Thus, the defendants maintain, it was determined that Santangelo would represent Locascio only after this court stated that it might disqualify Mitchell during the course of the trial.

This version of events—offered by the defendants to suggest that this court left them with no choice but to engage Santangelo on the eve of trial—omits certain important facts of which the defendants and their counsel are most certainly aware. Foremost among these, the government never moved to disqualify Mitchell. Although the prosecutors indicated to the court by letter dated September 30, 1991

that they believed that Mitchell should not have undertaken representation of Locascio and that Mitchell should withdraw from the case, the government stated that, if Mitchell agreed to certain conditions on his representation, his "presence should not prevent us from obtaining a fair trial." Letter from AUSA John Gleeson to Court, September 30, 1991, at 7. Mitchell did in fact agree to the conditions suggested by the government, and, thus, no challenge to Mitchell's representation of Locascio remained for this court to resolve.

The government had intimated in its letter of September 30, 1991, however, that it might have been appropriate for the court to disqualify Mitchell *sua sponte* under DR 5–101 and under DR 5–102. The defendants now state that they grew apprehensive as this "question" of *sua sponte* disqualification remained open until several weeks before trial, and that such apprehension precipitated the entry of Santangelo. But this somewhat disingenuous contention of the defendants ignores the fundamental fact that DR 5–101 and DR 5–102 are, by their own terms, addressed to counsel—not to the court. That is, DR 5–101 and DR 5–102 explicitly place the burden in the first instance on the *lawyer*—not on the court— to determine what conduct by that lawyer would be consistent with the ethical directives of the profession. As the Supreme Judicial Court of Massachusetts observed, DR 5–102, as with the entirety of the ethical code, is "self-executing." *Borman,* 393 N.E.2d at 856. For this reason, a lawyer is expected "to know and comply with its provisions." *Id.* Thus, if Mitchell had in fact been troubled—as the defendants now claim—by the "unresolved" matter of his potential disqualification, the appropriate path for him was clear, as was previously discussed:

> If an attorney is unsure whether in a given case his conduct violates the code, he should terminate the questionable conduct or seek the advice of the appropriate Committee on Ethics and Professional Responsibility. If he persists in questionable conduct, he risks disciplinary action including disbarment.

*Id.* The burden of ensuring compliance by Mitchell with DR 5–101 and with DR 5–102 has always been squarely on the shoulders of Mitchell himself. Indeed, in that the stumbling block of Mitchell's representation has been the fact that his law partner, James LaRossa, will testify for the government, and in that an intimate knowledge of the content of that testimony is far more readily accessible to Mitchell than it is to the court, it has always been clear to this court—as it should have been perfectly clear to Mitchell—that Mitchell was better positioned to make an informed ethical judgment about the propriety of his participation in this case. Such are the terms of DR 5–101 and of DR 5–102 and such have been the circumstances of this matter.

Thus, when this court advised Mitchell on December 30, 1991 that it did not intend to disqualify him *sua sponte* at that time, the court simply reminded Mitchell of his primary responsibilities under the ethical code: The court reminded Mitchell that it was his responsibility in the first instance to resolve the question of the propriety of his representation of Locascio; and the court reminded Mitchell that, if it became clear at trial that Mitchell had failed to conform his professional conduct to the dictates of the Code, the court would necessarily disqualify him at that time. Hence, far from introducing any "surprises" to Mitchell or to his client, the court simply instructed Mitchell to do what every lawyer is ethically obligated to do. If this admonition by the court precipitated the decision of the defendants not to permit Mitchell to present Locascio's defense to the jury, it can only be concluded that it was not until this admonition that Mitchell began to consider seriously the application of DR 5–101 and of DR 5–102 to his representation of Locascio. The defendants cannot now be heard to complain that Locascio has been prejudiced by the instructions of this court to Mitchell to conform his behavior to the ethical mandates of the profession.

■ The defendants have also argued that one of Locascio's attorneys, David S. Greenfield, has been attempting to withdraw from this case since November 12, 1991; hence, they seemingly suggest, the disqualification of Santangelo will—because Mitchell has reconsidered his ethical standing—leave Locascio without any lawyer at all. On this point, several observations must be made.

First, Greenfield has never made an appropriate application for leave to withdraw from his representation of Locascio. Rule 3(c) of the General Rules for the United States District Courts for the Southern and Eastern Districts of New York provides in full:

> An attorney who has appeared as attorney of record for a party may be relieved or displaced only by order of the court and may not withdraw from a case without leave of the court granted by order. Such an order may be granted only upon a showing by affidavit of satisfactory reasons for withdrawal or displacement and the posture of the case, including its position, if any, on the calendar.

Greenfield has not even attempted to comply with the requirements of Rule 3(c): He has submitted no affidavit to the court, and he has set forth no "satisfactory reasons" for his withdrawal. Rather, Greenfield simply sought "to inform" the court by letter dated November 12, 1991 that, with the permission of the court, he was "respectfully withdrawing as trial counsel" for Locascio. Letter from David S. Greenfield to Court, November 12, 1991. Indeed, his brief letter offers no explanation at all for his request to withdraw; it does, however, indicate that Greenfield would remain available to cross-examine James LaRossa at trial "should that eventuality arise." *Id.*

Second, the more recent statement by Locascio (in an unsigned affidavit submitted to the court only days ago) that he in fact discharged Greenfield in the autumn of 1991 is in no way corroborated by the terse letter through which Greenfield initially sought to withdraw from this case. *See* Affidavit of Frank Locascio ¶ 2. Greenfield in fact offered no explanation for his attempt to withdraw. One might expect that, if the more recent explanation of events offered by the defendants were true, Greenfield would have considered it

worthy of mention to the court that the reason he sought to withdraw was that his client had already fired him.

Indeed, this court has never granted Greenfield permission to withdraw from his representation of Locascio in this case, and the court reiterates now that such permission is not forthcoming. A district court may rightly refuse a "last-minute change in counsel" that would disrupt the trial schedule. *United States v. Solina*, 733 F.2d 1208, 1211 (7th Cir.), *cert. denied*, 469 U.S. 1039, 105 S.Ct. 519, 83 L.Ed.2d 408 (1984). *A fortiori*, then, this court may rightly refuse a last-minute withdrawal by the only attorney for Locascio who is, apparently, free of any conflict of interest or other ethical taint. *See also United States v. West*, 877 F.2d 281, 286 (4th Cir.), *cert. denied*, 493 U.S. 869, 110 S.Ct. 195, 107 L.Ed.2d 149 (1989) ("The determination of whether or not a motion for substitution of counsel should be granted is within the trial court's discretion...."); *United States v. Torres*, 793 F.2d 436, 440 (1st Cir.), *cert. denied*, 479 U.S. 889, 107 S.Ct. 287, 93 L.Ed.2d 262 (1986) (not abuse of discretion by district court to refuse "eleventh-hour" dismissal by defendant of his attorney when attorney has "acted diligently and competently"); *United States v. Mills*, 597 F.2d 693, 700 (9th Cir.1979) ("The denial of a motion to dismiss counsel is a matter resting within the sound discretion of the trial judge."); *United States v. Michelson*, 559 F.2d 567, 572 (9th Cir.1977) ("This Court has recently reiterated its adherence to the rule that a trial court properly acts within its discretion when it refuses to allow the substitution of counsel on the eve of trial.").

Greenfield represented to this court several months ago that he would be prepared to proceed to trial in defense of Locascio by September of 1991; since that representation was made, this court has not excused Greenfield from this matter. Now that both the attorneys who have made appearances for Locascio since September have been shown to have either actual or potential ethical difficulties in their representation of Locascio, the necessity of Greenfield's continued participation in this matter on behalf of his client is manifest.

## II

### *The Defendants' Cross–Motion to Disqualify John Gleeson*

■ Attached to the defendants' Notice of Motion to disqualify John Gleeson is an excerpt from a book, *Mob Star*, co-authored by Jerry Capeci, a columnist for the *New York Daily News*. The excerpted passage describes a 1987 incident from the previous federal criminal trial of John Gotti in this courthouse. That incident was the service of a subpoena on the hospital where Gleeson's wife was employed for the production of her personnel records. Gleeson himself took strong exception to this tactic, and the impropriety of the subpoena was acknowledged by the defense counsel who caused it to be served. Judge Nickerson, in quashing the subpoena on his own motion, remarked that it was "completely off the wall."

Defense counsel in this case now argue that, partially as a result of that incident, Gleeson has an "intense personal interest" in this prosecution and should therefore be disqualified. Upon the most cursory analysis, this argument boils down to the following: 1) An entirely inappropriate subpoena was served for the personnel records of Gleeson's wife; 2) Gleeson (unsurprisingly) took exception to it; 3) the defense attorney responsible recognized its impropriety and apologized in writing; 4) the court quashed the subpoena on its own motion; 5) therefore, Gleeson has an "intense personal interest" in this case warranting his disqualification. The speciousness of this reasoning is so patently apparent as to suggest that the only purpose for asserting it is harassment. A passing reference to 28 U.S.C. § 1927 may be instructive here.

The second basis for the cross-motion is that Gleeson should withdraw withal if it is apparent that he should make himself available as a witness. The argument runs as follows: 1) In an intercepted conversation of November 30, 1989, the following remarks are made:

GOTTI: They hate me ... (IA)[4] ... prosecutors. If this is fucking Gleeson again, this fucking rat motherfucker again....

GRAVANO: You think it's gonna be him?

LOCASCIO: Well, I think them now or later.

GRAVANO: You think it's going to (IA) I don't think they're going to be like Gleeson or Giacalone.

2) Gravano decided to cooperate with the government. 3) "It is perfectly reasonable to assume" that Gravano's decision to cooperate was motivated in substantial part by his concern that Gleeson would go to any ends to ensure his conviction, and thereby right the perceived wrongs that the defendants had committed against Gleeson personally. 4) Therefore, Gleeson's involvement in Gravano's decision to cooperate is a proper subject of proof, and Gleeson should be called as a witness.

It should be noted at the outset that it was Gotti, not Gravano, who said the prosecutors hate him. Conceding that Gravano's motive to cooperate may be the subject of cross-examination when Gravano testifies,[5] there is simply no reason why, on the basis of the conversation excerpted above, Gleeson should be available as a witness if it is *Gravano's* motive that the defense believes to be relevant.

There is another cogent reason for concluding that the cross-motion should be denied as baseless. The law is clear, in this circuit and elsewhere, that the defendant can call government counsel as a witness only if required by a compelling and legitimate need. To permit otherwise would be to countenance a procedure which would inevitably confuse the distinction between advocate and witness, between argument and testimony. *See United States v. Dupuy*, 760 F.2d 1492, 1496 (9th Cir.1985); *United States v. Schwartzbaum*, 527 F.2d 249, 253 (2d Cir.1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976); *United States v. Torres*, 503 F.2d 1120, 1124 (2d Cir.1974); *United States v. Newman*, 476 F.2d 733, 738 (3d Cir.1973). There is neither a legitimate nor a compelling need—indeed, there is no need at all—for Gleeson to testify.

The third basis for the cross-motion is generated by the unexplained modification of the text of various of the tape recorded [sic] conversations which the Government has offered in support of their present motion. Defense counsel is confident that the Court will agree that the reference by the Government to "meter" is not accurate and that what is really said is "on my behalf." (Opp.Mem. at 36)

Having listened to the tape recordings in question more than a dozen times, the court finds defendants' confidence misplaced. There is no doubt in the court's mind that the word used by Gotti in the April 18, 1990 conversation is "meter".[6]

The defendants' use of the government's previous draft transcripts in support of their cross-motion is particularly egregious in that it flagrantly violates a prior order of this court. Not long after the defendants were indicted, their counsel requested that the government provide draft transcripts of the intercepted conversations. Upon learning that the government had tentative draft transcripts and was preparing others, the court determined that disclosure would be helpful to the defendants in their preparation for trial. Recognizing that these transcripts were still tentative, and might contain errors, the defendants consented to the entry of an order dated July 1, 1991, which stated in relevant part:

*Ordered,* that draft transcripts provided prior to trial cannot be used against the government by any person, in any proceeding ... and it is further

---

**4.** The notation "(IA)" indicates inaudible portions of the conversation.

**5.** The court does not here suggest that there are no limits on the scope of cross-examination. *See, e.g., Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986).

**6.** The defendants are free, of course, to argue their version of the transcript before the jury; it will not, however, avail them for the purposes of this motion.

*Ordered,* that the defendants agree that the use of any draft transcripts will be limited to trial preparation for this case and may not be used at trial by the defendants for any purpose whatsoever....

Because the defense explicitly recognized that the transcripts furnished by the government were tentative and because they consented to the entry of the order set out above, the use of those transcripts here would be more so a fitting object for sanctions under 18 U.S.C. § 401(3) than the basis for a successful motion to disqualify a member of the prosecution.

Accordingly, the motion to disqualify Santangelo is granted, and the motion to disqualify Gleeson is denied.

SO ORDERED.