**Frank LoCASCIO, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**No. 00–CV–6015 (ILG).**

United States District Court, E.D. New York.

May 8, 2003.

Diarmuid White, Esq., White & White, New York.

Nicolas Bourtin, Esq., Assistant U.S. Attorney.

Dennis P. Riordan, Esq., San Francisco, CA.

## MEMORANDUM & ORDER

GLASSER, District Judge.

Frank LoCascio has moved this Court, pursuant to 28 U.S.C. § 2255, for an order that would vacate a judgment of conviction entered on June 23, 1992. This is his fifth endeavor to obtain relief since then, preceded by four motions pursuant to Rule 33, Fed.R.Crim.P. in which he sought a new trial. The bases upon which those motions were brought are summarized in this Court's decision in *United States v. Gotti*, 171 F.R.D. 19 (E.D.N.Y.1997) with which familiarity will be presumed. The bases upon which this motion is brought are: (1) the indictment of Gravano in Arizona in the year 2000 requires the conclusion that the government, in 1992, elicited his testimony implicating LoCascio in the crimes for which he was convicted knowing that his testimony was false; (2) the government withheld information regarding the true nature of Gravano's plea agreement; and, (3) that he (LoCascio) was deprived of the effective assistance of counsel.

It would, I believe, contribute to an appreciation of what follows, to keep in mind that after a trial the transcript of which exceeds 8,000 pages, at which testimony of

upwards of thirty witnesses was presented, and received in evidence were audio cassettes of electronically intercepted conversations, transcripts of which filled seven loose leaf binders which aided the jury while listening to the cassettes, extensive video recordings, photographs and documents. LoCascio was convicted of substantive and conspiracy violations of the RICO Act; conspiracy to murder and the murder of Louis DiBono; conspiracy to murder Gaetano Vastola; conducting illegal gambling businesses; loansharking conspiracy; obstruction of justice: bribery of a public servant and conspiracy to defraud the United States in connection with the collection of John Gotti's taxes.

The first post-trial motion filed by Gotti and LoCascio by one of the "motion attorneys" for them, William M. Kunstler, pursuant to Rule 33, Fed. R. Cr. Pro., the First, Fifth and Sixth Amendments to the United States Constitution and 28 U.S.C. §§ 144 and 145 sought to set aside the jury verdicts; obtain the dismissal of the indictment for prosecutorial misconduct; or, in the alternative, granting them a new trial; recusing this Court from all subsequent proceeding, granting an evidentiary hearing to prove the allegations set forth in Mr. Kunstler's affirmation; and providing them with names, addresses and telephone numbers of the anonymous trial jurors together with the right to subject to forensic analyses certain documents described in Kunstler's affirmation. In another motion filed simultaneously with the one just described, based upon the same constitutional provisions, they sought an order unsealing portions of the trial transcript relating to *in camera* proceedings affecting certain jurors. Those motions were denied in a Memorandum and Order of 23 pages, dated June 23, 1992, familiarity with which is assumed.

The second motion pursuant to Rule 33 was prompted by redacted copies of two FBI 302 forms which came to the attention of the government which suggested that Gravano participated in particular murders. Based upon those reports, LoCascio asserted that Gravano committed perjury by not disclosing those murders when he testified at the defendant's trial. In a Memorandum and Order dated October 29, 1992, familiarity with which is assumed, that motion was denied.

The third Rule 33 motion is predicated upon another FBI form 302 which prompted Gotti and LoCascio to allege that FBI agents were familiar with information which would have once again established Gravano's trial perjury and was not disclosed in violation of the government's Brady obligation. In a Memorandum and Order dated March 2, 1993, familiarity with which is assumed, that motion was denied.

The fourth Rule 33 motion filed by the defendants rests upon the same claims, namely, that Gravano's testimony at their trial was perjurious. In a 77 page Memorandum and Order dated April 3, 1997, and reported in 171 F.R.D. 19 (E.D.N.Y.1997) familiarity with which is also assumed, that motion was denied.[1]

I turn now to his latest claims for relief.

---

1. Gravano's alleged perjury based upon what has come to be known as the "Conte letter" was the subject of precisely the same issue in *United States v. Gambino*, 59 F.3d 353 (2d Cir.1995). Thomas Gambino was initially a named defendant with Gotti and LoCascio. He was severed and later tried separately. In addressing the perjury claim, the Court wrote: "But we are unpersuaded that any perjury occurred. Gravano had stated under oath in those earlier trials of Gambino organization members that he and the Gambino organization had a principle of not dealing in drugs. Yet, that policy statement is not flatly inconsistent with his having become involved on his own, and John Gotti's behalf in a

## A. The trial testimony of Salvatore Gravano

Although styled a motion pursuant to 28 U.S.C. § 2255, the petitioner's memorandum would suggest that he seeks reconsideration of this Court's decision denying his motion for a new trial pursuant to Rule 33, Fed. R. Cr. P. in 1997. Referring to that decision and to the proceeding at which Gravano was sentenced in which his credibility was commented upon, he then asserts "That ruling must be *revisited* due to the discovery of new information that throws its accuracy into grave doubt." (emphasis added) Memo at 4.[2] If Local Civil Rule 6.3 were to be applied this being a civil proceeding, this motion, regarded as one to reconsider, would be nearly four years too late. The foregoing aside, the motion will be addressed as styled, pursuant to § 2255.

■ The "New information" is Gravano's indictment on March 2, 2000, in Arizona charging him with trafficking in MDMA ("ecstasy" pills), a controlled substance. From this LoCascio asserts that "Gravano's commission of the crimes for which he is presently under indictment in state court in Phoenix supports the entirely reasonable inference that the jury at LoCascio's trial was seriously misled as to the scope of the benefits Gravano would receive for testifying against LoCascio and Gotti .... There is no serious question that Gravano has committed new felonies, .... Yet Eastern District Prosecutors have failed to set aside his plea agreement and to prosecute Gravano for his past crimes, as is their legal right." Memo at

5–6. LoCascio's conclusion then based only upon an indictment, that "there is no serious question" of Gravano's guilt, had it been applied to him upon his indictment, would have obviated the need for his trial with the scrupulous emphasis attendant thereto upon the presumption of innocence and every other due process concern. His contention that the drug crimes charged in the Arizona indictment suggests that his denial of engaging in such crimes prior to testifying in LoCascio's trial more than 8 years ago was false would be unsupportable in logic or in law. See, e.g., *Russell Poling & Co. v. Conners Standard Marine Corp.*, 252 F.2d 167 (2d Cir.1958) (Inferences or presumptions of fact ordinarily do not run backwards); *W.F. Corbin & Co., v. United States*, 181 F. 296, 304 (6th Cir. 1910) ("But we know of no rule or law which permits us ... to draw from proof of the existence of present facts any inference or presumption that the same facts existed many years previously"); *In re Bates' Will*, 152 Misc. 627, 628, 274 N.Y.S. 93, 95 (Sum Ct. K. Co.1934).

The "reasonableness" of the inference which LoCascio urges to be drawn, namely that the government agreed with Gravano "That future criminality on his part would not endanger his deal for leniency" and "That the failure to reveal that aspect of the plea bargain to the defense or jury constitutes a grave due process violation" is, to put it charitably, questionable. A sentence of imprisonment of 94 years may be imposed if Gravano is convicted in Arizona. Gov't. Memo at p. 12. In addition, and perhaps more significantly and belying

---

heroin importation conspiracy. It is at most evidence that Gravano did not adhere to the rules of the organization of which he was a high-ranking member." 59 F.3d at 365. In rejecting a claimed *Brady* violation, the Court wrote: "Proof before the jury that this witness was involved in an abortive conspiracy

to import heroin and that he violated the policies of his own organization would scarcely have rendered his gloomy past worse." 59 F.3d at 366.

2. "Memo" refers to petitioner's Memorandum in support of his § 2255 motion.

the "reasonableness" of his inference, Gravano has been indicted by the government in this district with conspiracy to possess with intent to distribute MDMA in violation of 21 U.S.C. § 846 with a prospect of imprisonment, if convicted, for a term of 30 years. 21 U.S.C. § 841(b)(1)(C).[3]

LoCascio's assertion that the government's decision not to call Gravano to testify in the prosecution of *United States v. Radonjich*, 92 Cr 159(ILG) was because it believed his anticipated testimony, given twice before,[4] was false is an *ipse dixit*.

### B. *LoCascio Redux*

The evidence upon which a jury convicted LoCascio beyond a reasonable doubt is revisited yet again and yet again he persists in his view that "a full and fair review of the government's theory of [his] liability and the evidence it offered to support it at trial will establish that [his] convictions required reliance on Gravano's testimony." Memo at 9.

This Court addressed that view at great length in 171 F.R.D. 19 and if the principle of claim preclusion is to have any meaning at all, the Court should not be required to address it again beyond repeating what it decided then at 171 F.R.D. at 28:

> The common thread that runs through this and the prior motions and which is hopelessly misplaced in the overall fabric of this case is that Gravano was the government's key and indispensable witness without whom these defendants [Gotti and LoCascio] could not have been convicted. Conveniently avoided is the fact that prior to and after the severance of Thomas Gambino, Salvatore Gravano was a named defendant in the indictment of this case together with

John Gotti and Frank LoCascio and a mere ten weeks or so prior to Gravano's election to cooperate, the government was fully prepared to proceed to trial against all three. Conveniently, and surely deliberately avoided is any reference to the words from their own mouths which convicted them and which Gravano's testimony essentially echoed. The recognition of that unassailable fact was acknowledged with exquisite simplicity by counsel for LoCascio in his opening statement to the jury: "This is a tape case" . . . .

Tr. at 1599.

> The validity of that acknowledgment and the inevitability of their conviction based upon those tapes alone will be made plain by a reading of the words which fell from their mouths and which will be set out as they pertain to the indictment.

The Court then set out at some length the words, captured on tape which, paraded before the jury, inexorably led to their conviction. Those words are to be found on pages 28–33 of 171 F.R.D. which are here incorporated by reference.

Inexplicably, LoCascio writes that "In its 1997 ruling, this Court rested its denial of the Rule 33 motion partially on its conclusion that, 'The inevitability of the [defendants'] conviction based on [the taped evidence] alone' . . . rendered any *Brady* violations which have been committed concerning Gravano and whatever perjury Gravano may have tendered against LoCascio harmless error. The Second Circuit did not discuss or rely on this particular conclusion in its 1998 unpublished order affirming this Court's order."

---

**3.** Gravano was sentenced in this Court to a term of imprisonment of 240 months to be followed by supervised release for life and fined $100,000.

**4.** Once in the trial of Gotti and LoCascio and again in the trial of John Pape, the juror compromised by Radonjich, who was subsequently tried and convicted.

That assertion compels a revisit of that unpublished order in which the Court reiterates LoCascio's arguments that: (1) the government deliberately suppressed evidence of Gravano's participation in the narcotics conspiracy [with Conte] which could have been used to impeach him at LoCascio's trial; (2) the government compounded its misconduct by having Gravano testify at LoCascio's trial that narcotics activity was not sanctioned by the Gambino family of which LoCascio, Gotti and Gravano were leaders; (3) Gravano misled the jury, with the government's knowledge, by stating that he pleaded guilty to all his crimes but making no mention of the narcotics conspiracy; (4) the government committed further misconduct by arguing in summation that Gravano's credibility was bolstered by his cooperation agreement knowing that he breached that agreement by giving misleading testimony at LoCascio's trial. Following that recital, the Court wrote:

> Judge Glasser carefully considered, and ultimately rejected, each of those contentions in an opinion reported at 171 F.R.D. 19 (1997). although LoCascio attempts to recast some of these arguments before this Court, we are not persuaded that we should disturb Judge Glasser's carefully reasoned holdings on this appeal.

166 F.3d 1202, 1998 WL 870230 at *1 (2d Cir.1998).

At Mem. 11–12, he reiterates his argument that the Second Circuit's description of the evidence against him is found in its entirety in excerpts culled from that Court's opinion at 6 F.3d at 943–44, 945, the essence of which are (1) that "His conviction was principally grounded on his presence in the Ravenite apartment during discussions of the crimes for which he was convicted;" (2) "[A]s the 'underboss,' LoCascio was present to help evaluate plans presented by Gotti and give advice as needed ..... Considering the precautions taken to ensure security, and after hearing the tapes of what was discussed in that apartment, the jury was entitled to consider whether it was likely that LoCascio would have been present during those conversations if he were not a participant." Tellingly, he omits the last sentence of that excerpt, which reads "*Although LoCascio's mere presence would not be sufficient to sustain his conviction, the government did far more than establish his presence.*" (emphasis added).

Tellingly too, omitted from his assertion that the foregoing excerpts from the Circuit Court's opinion constitute the "entirety" of that Court's description of the evidence against him, is the Court's view of the evidence presented at trial expressed as follows:

> The government's proof to support the allegations that Gotti and LoCascio had been in command of an extensive criminal enterprise was comprised mostly of lawfully intercepted tape-recorded conversations of the defendants-appellants and other alleged members of the Gambino Family. The government introduced tape recordings from four different locations over an eight-year period. The most significant evidence consisted of conversations intercepted at 247 Mulberry Street in New York during the period from late 1989 until early 1990. The government had installed three listening devices in that building: in the Ravenite Social Club on the first floor, in a hallway behind the club's rear door, and in an apartment two stories above the club ("The Ravenite Apartment"). It was this last location that proved the most fruitful for the government and the most damaging for the defendants. In the discussions in the Ravenite Apartment, Gotti, LoCascio and other Gambi-

no Family members discussed various illegal acts. These discussions formed the core of the proof against the defendants-appellants at trial.

6 F.3d at 930.

In furtherance of his persistent effort to persuade of Granvano's indispensable role in obtaining his conviction, LoCascio culls from the record selected excerpts from the government's closing statements to the jury in which it was suggested that the jury can and should convict on Gravano's testimony alone; that Gravano's testimony makes the proof in the case "absolutely suffocating;" that "He is of enormous value to us as a witness." Mem. at 13. Omitted, however, are those excerpts from the summation which this Court set out in 171 F.R.D. at 48. After referring to the tapes from the Ravenite Social Club, the hallway behind it, and the apartment above it, based upon which Gotti, LoCascio and Gravano were indicted, the government said:

Until November 1, 1991, that's what we had; that's all we needed. Those tapes convict these defendants . . . .

Tr. at 7352.

I suggest to you, ladies and gentlemen, . . . don't for a minute think that I am suggesting to you that you shouldn't be careful in evaluating his [Gravano's] testimony. You should. Salvatore Gravano was a major, major league criminal. You should be careful in assessing his testimony.

Tr. at 7364.

The Court did not, in its opinion of April 3, 1997, make reference to the many other excerpts from the governments summation which belie the defendant's obsessive assertion that Gravano's testimony alone was the basis for his conviction. For example:

The defendants want you very much, . . . to believe that we made a deal with Salvatore Gravano in order to get John Gotti and Frank LoCascio. Like everything else that is said to you, look to the evidence. The facts show otherwise. We have John Gotti, Salvatore Gravano and Frank LoCascio. We were ready to go without Gravano . . . .

The real significance to Gravano is not this case, because John Gotti opened the window on to this case. There are no new charges based on Gravano. All of those were provable before we had Gravano.

Tr. at 7368.

I submit to you, Ladies and Gentlemen, you can and you should convict on the tapes alone.

Tr. at 7369.

LoCascio once again rails against his conviction of the conspiracy to murder and the murder of DiBono; the conspiracy to murder Vastola; of conducting illegal gambling businesses; of the extortionate extensions of · credit ("the loan-sharking") conspiracy; the obstruction of justice; of the "tax" conspiracy. That this is yet another attempt to re-litigate that which has been repeatedly denied is clearly (and probably unwittingly) evidenced by his introduction to his "Statement of Facts." viz., *"The Case Against LoCascio Revisited."* Mem. at 8.

■ The case against LoCascio was deemed by a unanimous jury to have been proved beyond a reasonable doubt and his conviction was affirmed by the Court of Appeals in an opinion which reflected a meticulous review of the record and a careful consideration of the arguments advanced by the defendants. *United States v. Locascio,* 6 F.3d 924 (2d Cir.1993). Given that jury verdict, the affirmance of that verdict by the Court of Appeals, the four rejections of his Rule 33 motions, the last of which was in an exhaustive factual and

procedural review of the record and of his claims for relief, reported in 171 F.R.D. 19 (E.D.N.Y.1997) and affirmed in 166 F.3d 1202 (2d Cir.1998), it is difficult to comprehend his insistent disregard of those determinations. A cursory review of that insistence follows.

### The Louis DiBono Charges

"The government's proof as to the DiBono conspiracy . . . consisted of taped evidence that, in LoCascio's presence, Gotti twice said that DiBono would be 'whacked' for not 'coming in' to see him." Mem. at 9.

### The Unfulfilled Conspiracy to Murder Corky Vastola

"Viewed most favorably to the government, the trial evidence showed LoCascio attended a meeting on January 24th at which some participants expressed a willingness to assist other parties in exploring whether the conditions necessary for the murder of Vastola . . . could be fulfilled."

\*      \*      \*      \*      \*      \*

Then he provides this excerpt from the government's response to LoCascio's Rule 29 motion:

"It is our position legally that Frank LoCascio's presence served the purpose and *that he need not utter one word at all to be part of the conspiracy to kill Corky Vastola.* (emphasis his)." Mem. at 9–10.

Immediately following that statement, but omitted by LoCascio is: "The fact that he does speak, speak in a way that demonstrates both his participation in this plan of how it gets presented and evidences his desire that it happen, further defeats the defendant's motion to dismiss this count, even before it gets to the jury."

Tr. at 6910.

### The New York Gambling Operations

"The evidence was uncontradicted that LoCascio received no money and had no involvement in the operation in question." Mem. at 10. The jury acquitted LoCascio of this charge and in doing so manifested an obedience to the Court's instruction to consider each Count as against each defendant separately.

### The Connecticut Gambling Operation

"The evidence was undisputed that LoCascio received no money from any gambling operation in Connecticut." Mem. at 10–11.

That the jury convicted LoCascio of this Count proves that the "uncontradicted," "undisputed" evidence established his guilt beyond a reasonable doubt.

He also insists that there was "no evidence" of his participation in a loan-sharking conspiracy and "no evidence" that he "said or did anything to obstruct justice" and that his conviction of tax conspiracy was based "on one short segment of the December 12, 1989 conversation" and upon the government's arguing his conviction on the ground that he was Gotti's underboss. Mem. at 11.

His persistence in advancing his view that there was no evidence to support his conviction of all of the aforementioned crimes can only be characterized as a delusional belief that he was never a defendant in a trial at the conclusion of which he was found guilty beyond a reasonable doubt by a jury he found to be satisfactory and whose finding was deemed to be supported by the evidence by a United States Court of Appeals. His implicit assertion that he was found guilty of the DiBono and Vastola murder conspiracies only because he was merely present at the wrong place at the wrong time continues to ignore the succinctly explicit determination by the Court of Appeals, viz., "LoCascio, however, was not convicted for his mere presence." 6 F.3d at 944.

It is remarkable to read that "According to Gravano, he, Gotti, and LoCascio were members of the Gambino Family Administration," Mem. at 12 suggesting that the only evidence of that fact was merely Gravano's saying so. Blithely ignored is the pronouncement by Gotti that "this is gonna be a 'Cosa Nostra' till I die." GX 301.1A(T) at 93: that "soon as anything happens to me ... Sammy is the 'Acting Boss. He's our consigliere"' GX 300.1A(T) at 4; that "You're my fuckin' 'Underboss.' Correct me, Frankie." GX 304.1A(T) at 9. His assertion that "It was Gravano's testimony describing the 'function' of an 'underboss' upon which the government rested its 'functional presence' argument against LoCascio" Mem. at 11–12, ignores the testimony of Special Agent Schiliro who described the structure of an organized crime family and the function of the boss, the underboss and the consigliere, among other things. Tr. at 2006.

LoCascio once again contends that the government violated its *Brady* obligations by not revealing its knowledge that Gravano discussed narcotics trafficking with Pasquale Conte, a Gambino Family captain. He asserts that the rejection of his prior claim in that regard was bottomed upon the Court's assessment of Gravano's credibility, an assessment which, he insists, must be revisited in the light of Gravano's subsequent conviction of drug dealing in this district and in Arizona. Even a cursory reading of this Court's rejection of his previous *Brady* claim would reveal that there isn't a jot or a tittle to suggest that it was induced by this Court's assessment of Gravano's credibility. That reading would plainly reveal that his *Brady* claim was rejected because (1) his claim was not based upon newly discovered evidence, 171 F.R.D. at 47, aff'd. in 166 F.3d 1202, 1998 WL 870230, at *1 (2d Cir.1998); (2) the allegations on which he relied were "merely cumulative or impeaching" material

which do not warrant the relief he sought, 171 F.R.D. at 52, aff'd. 166 F.3d 1202, 1998 WL 870230, at *2; and (3) the *Brady* rule is not "violated if the defendant or his attorney either knew, or should have known, of the essential facts that would permit critical scrutiny of a witness's testimony .... The testimony carefully elicited from Gravano by the government as to the Gambino Family administration's knowledge that certain crews were dealing in drugs, specifically naming Conte's crew as being one of them, was clearly designed to put LoCascio on notice of facts that would have permitted careful scrutiny of Gravano's testimony assuming that as a member of the administration he didn't already have that knowledge." 171 F.R.D. at 51, aff'd. 166 F.3d 1202, 1998 WL 870230, at *2. It is important to note in this regard, that which was already noted in this Court's previous opinion, namely: "The many crimes with which the defendants were charged did not include the violation of drug laws in any respect. Throughout the trial the defendants emphasized that point repeatedly, vociferously objected to any testimony which suggested that the defendants were involved in any drug offense, and requested the Court on more than one occasion to instruct the jury that narcotics trafficking is not one of the issues before them. Tr. at 1991–92, 5375–78, 7325." 171 F.R.D. at 38. One snippet of the direct examination of Gravano speaks eloquently to the disingenuousness of LoCascio's claim:

> Q. Were there crews within the Family that, to your understanding as underboss, were, nevertheless, involved in narcotics trafficking?
>
> A. Yes.
>
> Q. Which crews?
>
> Mr. Mitchell [LoCascio's lawyer]: Your Honor, I object to this entire line
>
> THE COURT: Overruled

A. Johnny G's family, *Patsy Conte's crew*, Eddie Lino's crew. Angelo Ruggiero's crew. (emphasis added).

Tr. at 3979–81, 171 F.R.D. at 46–47.

As has been previously observed, the claim that Gravano's testimony about the crimes he committed with LoCascio and Gotti is unworthy of belief because of the crimes he committed without them some eight years later is bad logic and bad law.

LoCascio also claims that Gravano's arrest in 2000 provides a basis for the Court's reconsideration of its prior conclusion that "The contention so vigorously pursued that the government impermissibly vouched for its witness is quite simply neither supported nor supportable by the record." 171 F.R.D. at 48. The record upon which that conclusion was based is to be found there and is incorporated here by reference to it. That conclusion was affirmed by the Court of Appeals which wrote: "Finally, LoCascio asserts that the government engaged in improper bolstering of Gravano through references to his cooperation agreement. We agree with the district court that their contention is 'quite simply neither supported nor supportable by the record.'" 166 F.3d 1202, 1998 WL 870230, at *3 (2d Cir.1998).

LoCascio makes another attempt to revisit his *Brady* claim by speculating that the government made an undisclosed promise not to prosecute Gravano regardless of any crimes he may commit in the future and such a promise would entitle him to a new trial. The premise upon which that speculation is based is that Gravano had not been prosecuted by the government for the crimes he committed in 2000. That premise proved to be false—Gravano was prosecuted by the government and sentenced for those crimes.

**C. The Ineffective Assistance of Counsel Claim is Time Barred**

(1) Eight years after his conviction, but ostensibly only two years after the Court of Appeals opinion in 1998, LoCascio claims that he first became aware that he was ineffectively represented by counsel. That revelation is derived, he claims, from the following observation by the Circuit Court, affirming this Court's denial of his fourth Rule 33 motion: "It is more probable than not that LoCascio, who together with Gotti and Gravano administered the Gambino Crime Organization, was fully aware of Conte's narcotics trafficking as were Gotti and Gravano. In addition, LoCascio and Gotti conducted a joint defense at trial and we have no reason to believe that they were not sharing all information relevant to their defense. It is evident to us as it was to the district court, that for strategic reasons neither Gotti nor LoCascio sought to examine Gravano on his statements regarding narcotics trafficking." 166 F.3d 1202, 1998 WL 870230, at *1 (2d Cir.1998).

From that claimed revelation, LoCascio proceeds to interpret the foregoing observation to mean that the Court of Appeals concluded "that it was therefore 'evident' that LoCascio's counsel did not pursue the issue with Gravano because he shared Gotti's 'strategic' reasons for doing so." Mem. at 28. That interpretation subtly conveys the misleading thought that although it may have been in LoCascio's interest to "pursue the issue with Gravano" his counsel forewent the opportunity to do so because it would not have been in Gotti's interest. That it was also in LoCascio's interest not to pursue it was this Court's view at 171 F.R.D. at 51–52, expressed as follows: "It may also be inferred, given the close association between Gotti and LoCascio already known to the jury, that to cross-examine Gravano on the Conte

letter and thus reveal Gotti's involvement, to that extent, in drugs, would result in spillover prejudice to LoCascio with which he would have wished to avoid.... The strength of that inference is made manifest by the vigorous objections to any mention of drugs repeatedly made by the defendants." (internal citations omitted). The Court of Appeals agreed, writing that "It is evident to us, as it was to the district. court, that for strategic reasons neither Gotti nor LoCascio sought to examine Gravano on his statements regarding narcotics trafficking." 166 F.3d 1202, 1998 WL 870230, at *1 (2d Cir.1998).

■ The foregoing aside, LoCascio's ineffective assistance of counsel claim is barred as a plain reading of 28 U.S.C. § 2255 would compel. That statute provides as follows in relevant part:

A 1–year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of -

(1) the date on which the judgment of conviction becomes final;

\* \* \* \* \* \*

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

The date on which the *judgment of conviction* became final was on May 2, 1994, when certiorari was denied by the Supreme Court in 511 U.S. 1070, 114 S.Ct. 1646, 128 L.Ed.2d 365 (1994) following the affirmance of the judgment of conviction by the Court of Appeals in 6 F.3d 924 on October 8, 1993. This petition filed almost 6 years after Mary 2, 1994, is clearly untimely under 28 U.S.C. § 2255(1). In *Clay v. United States*, 537 U.S. 522, 123 S.Ct. 1072, 1076, 155 L.Ed.2d 88 (2003) the Court held that in the context of postconviction relief, "Finality attaches when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." The Supreme Court's denial of certiorari on October 4, 1999, following the denial of his Rule 33 motion was not the date on which his judgment of conviction became final.

This petition is timely, as he recognizes, only if it was filed within one year of "the date on which the facts supporting the claim ... presented could have been discovered through the exercise of due diligence" pursuant to § 2255(4). If, as he declares, he first discovered that he might have an ineffective assistance claim upon the issuance of the Second Circuit's opinion in *United States v. Gotti* on December 8, 1998, in 166 F.3d 1202, 1998 WL 870230 (2d Cir.1998), the one year period of limitation began to run then, not on October 4, 1999, when the Supreme Court refused to review it. That LoCascio first became aware of the strictures (if indeed there were any) under which his counsel labored when he read the Second Circuit's opinion on December 8, 1998, defies credulity.

That incredulity is made manifest in a conversation in the apartment above the Ravenite Social Club on November 30, 1989, at which, in LoCascio's presence, Gotti was overheard to say:

I'm trying to think what's good for the overall picture, Sammy. First thing is this. With these fuckin' lawyers on all these cases like, even for a bail application, they gotta go in there, argue for your client, within certain parameters. Then after that, keep your fuckin' mouth shut. Like these guys, when Barry Slotnick got up on bail, on the bail hearing, "Your Honor, those charges don't pertain to my client.": Sit the fuck down, or I'll knock you down, you cocksucker! "Let the record show that, that's Mister Gotti they're talking about.

Not Mister Carneglia. Oh, that's Mister LoCascio you're talking about, not Mister Gravano." Sit down, or I'll knock you down, you motherfucker! Talk within certain parameters, and we'll win, we'll win.

GX 303.1A(T)

Not only is his claimed ignorance disingenuous, given "the tenacity with which defense counsel pursued Gravano on his cooperation agreement [and] [his counsel] objected to it being received when offered by the government" Tr. at 3948; the objection by his counsel to the government's eliciting from Gravano testimony about "crews within the [Gambino] Family that … were … involved in narcotics trafficking," *supra* at p. 314, naming Conte's crew specifically; but also by Gravano's testimony, elicited by the government as follows:

Q. Was there any discussion, after the indictment in this case, about George Santangelo coming into the case?

A. We considered him as an attorney in this case.

Q. Who considered it?

A. John did.

Q. Was there any discussion as to whom he would represent?

A. No. Me or Frankie.

Q. Did it matter?

A. No.

Q. Why not?

A. It was one defense team anyway. It didn't matter who he presented.

Q. Did he answer to John?

A. Yes.

Tr. at 4304.

"[E]ven the most objective reading of the entire trial record could lead only to the conclusion that there was an implicit, if not an explicit, joint defense attack mounted against the indictment." 171 F.R.D. at 34.

In an opinion reported in 771 F.Supp. 552 (E.D.N.Y.1991) this Court granted the government's motion to disqualify Gerald Shargel, Bruce Cutler and John Pollok from representing any defendant in this case at trial. Familiarity with that opinion is presumed. Thereafter, the government moved to disqualify George Santangelo from representing Frank LoCascio after his prior counsel David Greenfield, was granted leave to withdraw. That motion was granted in an opinion reported in 782 F.Supp. 737 (E.D.N.Y.1992), familiarity with which will also be presumed. In that opinion extensive excerpts of intercepted conversations between Gotti and Cutler were set out revealing in exquisite detail "Gotti's insistence upon knowing about and ultimately approving of all legal activity in the case not only on his own behalf, but also on behalf of others." 782 F.Supp. at 740. LoCascio's professed ignorance of that insistence in the light of those revelations is not credible.

In the light of the foregoing, the date on which the facts advanced in support of his claim not only could have been discovered, but were surely known even before his trial commenced and is plainly time barred.

Given his knowledge of the control over the legal process that Gotti insisted upon reserving to himself, what explanation can be given for LoCascio's acceptance of it? The answer is to be found, I suggest, in LoCascio's fundamental commitment to loyalty to the Gambino Crime Family and its boss as an immutable prerequisite to membership in that Family. A reflection of that view is to be found in an intercepted conversation on January 4, 1990, in the apartment above the Ravenite Club in which Gotti, Gravano and LoCascio were considering persons to be "made" mem-

bers of that Family. Goti was overheard to say: "I'm not trying not to make people (IA) I want guys that done more than killing." LoCascio was then overheard to say: "That's what you want .... Somebody that's loyal, faithful and he's there when you need him .... That's what you need." GX 300.1A(t) at 2, 20. His undying commitment to loyalty to his boss was expressed with some emotion in his statement to the Court on June 23, 1992, before being sentenced when he said, in part, "if there was more men like John Gotti on this earth, we would have a better country." Tr. at 11.

In the approximately 8 years that have intervened between the conclusion of the trial and the filing of this petition, LoCascio has been represented by highly regarded and very experienced defense lawyers on direct appeal and on his numerous motions. The argument advanced on his behalf in each of those proceedings can leave no doubt that those lawyers were thoroughly familiar with the entire record of the trial. That not even the glimmer of a thought that his trial counsel's failure to cross-examine Gravano on drug dealing (indeed, given his counsel's objecting to the government's eliciting his testimony about drug dealing) was attributable to his ineffective assistance can only be explained because it wasn't, or, as was evident to this Court and the Court of Appeals, the failure to examine Gravano on drug dealing was for strategic reasons.[5]

In sum, even upon the most tenuous albeit unwarranted assumption that his claim has any validity, the facts supporting it could have been discovered through due diligence years before this petition was filed it is, in addition to being meritless, also time barred.

The emphasis upon Cardinale obscures the fact that LoCascio was also vigorously represented at trial by John Mitchell, an able and experienced defense lawyer. Without reviewing the entire 8,000 page record again for the purpose of establishing his significant role on behalf of LoCascio, I would make reference instead only to his presentation of a Rule 29(a) motion for a judgment of acquittal which was a comprehensive review of the evidence and a lucid argument of the law, spread over 24 pages of the transcript. Tr. 6870–6894. His representation of LoCascio in the charge to be given to the jury was marked by a meticulous attention to virtually every word and nuance with a view to achieving a result that would provide every linguistic safeguard for his client. See Tr. 7291–7322 and 7712–7744. These few references will serve, it is believed, to provide a cameo picture of the significantly larger role he played in representing LoCascio throughout the trial.

The claim that Cardinale's ineffective assistance should have been apparent by his failure to cross-examine Gravano on drug dealing and by what he now asserts to be his less than effective summation, is also to suggest by implication that Mr. Mitchell silently acquiesced in his ineffectiveness or even aided and abetted it. No such claim is made by LoCascio. A scrupulously objective reading of the transcript of the trial, with a view to assessing Mr. Mitchell's contribution to LoCascio's defense, would compel the conclusion that such an implication would be unwarranted.

(2) In furtherance of the claim of ineffective assistance of counsel, another motion was filed on behalf of the petitioner on October 22, 2002, seeking the following

---

5. It is of nothing more than passing interest to note that Bruce Cutler, in his recent book, wrote "Tony Cardinale, along with John Mitchell had done an admirable job defending LoCascio as did Al Krieger for John." Cutler, Closing Argument (Crown 2003) at 202.

relief: (i) an Emergency Hearing in order to take testimony of a reluctant witness and thereby preserve evidence; (ii) the sealing of the proceeding to protect the safety of the witness, and (iii) permission to attend the instant motion under 28 U.S.C. § 2255 to vacate his convictions with respect to the defendant's ineffective assistance of counsel claim based upon new information discovered in the past three (3) weeks provided by Anthony Cardinale, Esq.

In support of that motion is a Declaration of Thomas A. Harvey, Esq. which, in substance, states that: (1) Cardinale revealed to him (Harvey) that Gotti threatened to kill him if he individualized the interest of LoCascio at Gotti's expense; (2) As a result of those threats, Cardinale was (a) prevented by Gotti from cross-examining Gravano concerning LoCascio's lack of involvement in the murder of DiBono; (b) threatened to be "taken care of" by Gotti for asking questions solely about LoCascio; (c) forced by Gotti to cross-examine witnesses about facts and charges that involved only Gotti; and (d) was forced by Gotti to concentrate on him during the second part of the summation; (3) Gotti threatened to harm him if he met alone with LoCascio; (4) Cardinale never revealed that information to LoCascio or anyone else, and does so now because Gotti is dead, although the threat has not been completely removed. Notwithstanding the publication of his identity, Cardinale refused to allow his sworn declaration in support of the motion to be submitted out of fear for his welfare and on advice of counsel, but allowed as how he will testify if compelled to do so.

Although no motion was made by prior counsel to be relieved, yet another Notice of Motion was filed on December 6, 2002, by Diarmuid White, Esq., for an order pursuant to Rule 15, Fed. R. Civ. Pr.

granting leave to amend his pending motion pursuant to 28 U.S.C. § 2255 and ordering an evidentiary hearing. The amendment he seeks would add the allegations of Cardinale's belated disclosure in support of his ineffective assistant claim. In support of this motion are the Declaration of Thomas A. Hardy summarized above (Ex. A); the Declaration of Dennis P. Riordan, Esq., counsel on the original § 2255 petition (Ex. B), who states in substance that he interviewed Cardinale and asked whether he suffered from a conflict of interest during LoCascio's trial prior to preparing this 2255 motion and Cardinale did not disclose that he did; the Declaration of Frank LoCascio who, acknowledging that he and Gotti "had some issues in common" states that he never agreed that Cardinale, who he retained, could act in Gotti's best interest at his (LoCascio's) expense and was unaware of Gotti's threats to kill Cardinale if he individualized his interests at Gotti's expense. He then repeats the information contained in Harvey's Declaration. (Ex. C).

The government was directed to file its response by January 31, 2003; the petitioner his reply by February 10, 2003, and argument to be heard on February 21, 2003. That schedule was subsequently amended and the government's response was submitted on March 7 and the petitioner's reply on March 17, 2003. In the interim, each side submitted submissions on the issues of the necessity or propriety of sealing the record which will be addressed hereafter.

The reasons advanced by Cardinale for his silence until now, defy credulity, stating as he does, that notwithstanding Gotti's death, he is still in fear for "his welfare." One is then led to infer that a degree of fear has fallen below a level, finely calibrated by Cardinale, which has now given him the comfort to come for-

ward that he didn't have while Gotti was imprisoned for life.

That observation aside, the bases upon which LoCascio claims entitlement to the relief he seeks are snippets from an extensive trial record in which when cross examining Gravano, Cardinale refers to *my client* when inquiring about the Connecticut and New York gambling counts and when inquiring about the loan-sharking count. (Def. Mem. at 6). He then represents that at the end of that day's proceedings, Cardinale would testify that "Gotti informed him if he said 'my client' again without saying John Gotti, Gotti would have Cardinale 'taken care of' which Cardinale interpreted to mean have him killed." (Def. Mem. at 6–7). Thereafter, he asserts, his cross-examination of Gravano made reference to "my client nor Mr. Gotti" when seeking to induce his testimony that neither was implicated in the crime about which he was being questioned.

It is important to note that a substantial portion of the cross-examination of Gravano related to the conspiracy to murder and the murder of Paul Castellano (Racketeering Act One); the murder of Thomas Bilotti (Racketeering Act Two); the conspiracy to murder and murder of Robert DiBernardo (Racketeering Act Three and Counts Three and Four); the conspiracy to murder and the murder of Liborio "Louie" Milito (Racketeering Act Four and Counts Five and Six) in each of which John Gotti alone, or John Gotti and Salvatore Gravano are named and in which LoCascio is not.

The snippets of the transcript he extracts to reflect the phrase "my client nor Mr. Gotti" relate to the murder of Joseph Colucci, of an unidentified man and of John Simone, crimes for which neither Gotti nor LoCascio were charged.

The view, so emphatically asserted, that Cardinale advocated more forcefully for Gotti than he did for LoCascio is belied by his summation seventeen days after he was allegedly threatened not to mention "my client" to the exclusion of Gotti. A few excerpts from that summation will suffice:

> "[A]fter sitting through this case representing Frank LoCascio for the past several weeks, I couldn't wait to get up."

Tr. at 7539.

> "On the evidence that they have presented against my client and against Mr. Gotti, or the lack of evidence—and I say that directly and point to this man because if there's anyone who knows the evidence in this case, or as Frank LoCascio is concerned, it is him, John Gleeson. He knows this case better than anybody, and he knows the lack of evidence against Frank LoCascio.
>
> Let me tell you something. When I am done, I hope to demonstrate to you that as far as Frank LoCascio is concerned, and as far as the charges against him are concerned, the charges should not even have been brought.
>
> Forget about the fact that the government hasn't proven anything, let alone proven beyond a reasonable doubt the elements of the crime against him."

Tr. at 7541.

> "The charges should not have even been brought. He shouldn't have been dragged from his home. He shouldn't have been put in jail for 16 months. He shouldn't even be sitting here."

Tr. at 7542.

> "Of course, there are seven charges against my client. We're going to go through them and I will demonstrate, I submit to you, and again hold me to it, act accordingly, they haven't proven a

thing against my client, not one, let alone seven."

Tr. at 7552.

They have to prove two, at least two crimes against Frank LoCascio.

Tr. at 7553.

Now, ... Frank LoCascio is charged, in some very, very serious charges, violent crime in aid of racketeering concerning a guy named DiBono ....

... What did he do? ... What can he do? Nothing. What did he say? Nothing ... the government's theory against Frank LoCascio in this regard is that he was somehow an aider and abetter.

They say while he wasn't there and he didn't do anything, he somehow aided and abetted and he's as guilty as somebody who pulled the trigger. That's what they are saying.

Tr. at 7557.

When you think about the case and about the charges that the government brought against Frank LoCascio, I want you to think about the issues of presence, presence with knowledge, and think about what he did or what he's supposed to have done, according to the government, what he did.

The case against Frank LoCascio, I see two bookends. On one end is DiBono. The other end is this tax Count.

Tr. at 7558.

When you look ... at that Count [the tax Count], you have to ask yourself a couple of questions. You have to say to yourselves, what did Fran LoCascio do? What was his participation?

Tr. at 7559.

And consider it, in fact, when I say the charges [the murder of Louie DiBono] should never have been brought against Frank LoCascio.

The intent of that charge was ... to put pressure on Frank LoCascio ....

What was it about the charge [the DiBono murder] that all of a sudden Frank LoCascio should be charged with it?

Tr. at 7564.

Where in this evidence that's been presented in there anything that in any way convinces you beyond a reasonable doubt that Frank LoCascio is guilty of running some gambling operation?

Tr. at 7588.

Extortion. Again, I sit here and I have sat next to Frank LoCascio I don't know how long now and I've been waiting for this evidence. He's charged with making extortionate extensions of credit. Where is the evidence? Where is the evidence that he said anything or even, in fact, if he was present when someone else said something about loansharking?

I wish I could get as direct as I am with the DiBono murder, as far as extortion is concerned, but there is no evidence.

Tr. at 7590–91.

Now we get to the obstruction of justice Counts.

\*     \*     \*     \*     \*     \*

But what did Frank LoCascio do?

\*     \*     \*     \*     \*     \*

What does LoCascio do? He doesn't say a word. Nothing. Zero. Zip.

Tr. at 7591.

But here he is, charged, facing very serious charges. No evidence. No evidence.

\*     \*     \*     \*     \*     \*

But I suggest to you, if you are being fair and honest as to that Count, either the obstruction or the bribery, ask yourself what did Frank LoCascio do?

How did he participate?

How did he endeavor to influence, obstruct or impede justice?

How did he do anything as far as other corrupt sources are concerned?

What did he do?

The answer is nothing.

Tr. at 7592.

His summation thus exposes the baselessness of his allegedly anticipated declaration, arguing as his summation does, the lack of evidence against LoCascio without a reference to or even a mention of Gotti.

■ For all the reasons advanced the motion is denied. The motion to amend the complaint pursuant to Rule 15, Fed. R. Civ. Pr. is denied for the reasons that it is futile because it is time barred, and without merit in all other respects. The "new evidence" upon which it is based, is not new at all. Gotti's insistence upon controlling the attorneys appearing not only on his behalf, but on behalf of other members of the organized crime family of which he was the boss, was captured on tape in the starkest terms and was known to LoCascio long before this trial began.

This belated motion is sought to be made pursuant to § 2255(4). That statute provides:

A 1–year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—

*  *  *  *  *  *

(4) the date on which *the facts* supporting the claim or claims presented could have been discovered through the exercise of *due diligence.* (emphasis added).

A parsing of the statute requires that some attention be paid to four significant words, namely "due diligence" and "the facts." Addressing "due diligence" first, the Court in *Wims v. United States*, 225 F.3d 186 (2d Cir.2000) provided guidance.

In that case, following the imposition of sentence, Wims told his attorney that a reduction of his sentence was "worth pursuing" and he believed that an appeal would be filed. In fact, no appeal was filed. He filed a § 2255 motion seventeen months after his conviction became final, claiming his recent discovery that an appeal was not filed. In considering the applicability of § 2255(4) the Court wrote:

The proper task in a case such as this one is to determine when a duly diligent person in petitioner's circumstances would have discovered that no appeal had been filed. [FN4] After that date, petitioner was entitled to further delay . . . so long as he filed his petition within one year of the date in which the discovery would have been made in the exercise of due diligence. [FN5]

FN4. . . . The statute does not require the maximum feasible diligence, only 'due,' or reasonable diligence.

FN5. We need not decide the question of how to apply § 2255(4) when a petitioner's actual discovery of the relevant facts precedes the date on which these would have been discovered through the exercise of due diligence.

225 F.3d at 190.

I confess to some uncertainty as to the meaning of FN5. It would seem that if the petitioner had already actually discovered the relevant facts, the question of due diligence would be irrelevant. There can be little doubt that LoCascio was completely aware, long before and during the trial, of Gotti's control over counsel and the legal proceedings in which he and members of the Gambino Crime Family were involved as the excerpts on page 317 *supra* make painfully clear. His actual knowledge of that fact makes superfluous a due diligence inquiry and if such an inquiry were to be made, due and reasonable diligence would have discovered the

relevant facts much more than a year before this last motion was filed.

Interestingly apposite on all four of the significant words—"due diligence: and "the facts," is *United States v. Pollard*, 161 F.Supp.2d 1 (D.D.C.2001), the facts in which are here summarized. Pollard pleaded guilty to conspiracy to commit espionage and was sentenced in 1987 to life imprisonment. In 1990, acting through counsel Hamilton Fox, Pollard filed a motion pursuant to § 2255 to withdraw his plea. His motion was denied later that year. He appealed that decision and was represented on that appeal by several eminent counsel, among whom was the current Solicitor General of the United States. The D.C. Circuit affirmed the denial in 1992. Eight years later, in 2000, he filed a second motion pursuant to § 2255(4) for resentencing, claiming a denial of effective assistance of counsel during sentencing and because counsel failed to file a notice of appeal from his conviction and sentence.

At sentencing, Pollard was represented by an attorney named Hibey. He argues that he didn't discover until 2000 that Fox failed to inform him of an ineffective assistance claim he did not raise in his first § 2255 motion because of a self-imposed restraint from criticizing Hibey. The ineffective assistance he learned was the deviation by Hibey from prevailing professional norms. Pollard admits that he knew Hibey failed to file a notice of appeal years before he filed the present motion, but argues that he didn't know until within the year of filing this motion that under the prevailing professional norms Hibey had a duty to file a notice of appeal.

The Court dismissed the motion finding that Pollard failed to demonstrate that he filed his motion within one year of " 'the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due dili-

gence.' " The Court based its conclusion upon the following reasons:

> First, paragraph four of § 2255 is only triggered when a defendant discovers facts, not the legal consequences of those facts. This Court does not accept defendant's assertion that the prevailing professional norms of a lawyer are facts, and thus covered by paragraph four .... Therefore, the Court rejects defendant's argument that discovery of the prevailing professional norms constitutes facts under paragraph four.

> \*    \*    \*    \*    \*    \*

> Section 2255(4) does not postpone the accrual of limitations based on ... an attorney's belated discovery or realization of the *legal consequences* of known facts. Rather, postponed accrual is in order only if the *facts* themselves supporting a legal claim were undiscoverable in a timely fashion despite due diligence. (emphasis in original).

161 F.Supp.2d at 10.

The court then went on to quote from *Fraser v. United States*, 47 F.Supp.2d 629, 630 (D.Md.1999) in which that Court pointed out that the clear language of paragraph four does not support Pollard's interpretation of it. The language quoted was:

> If Congress had meant for the timely filing provision of Section 2255 ... to be tolled because a defendant or his counsel did not appreciate the legal consequences of known facts, it could have—and would have—said so. It did not. Indeed, it is a well-recognized principle in analogous postponed accrual contexts that it is knowledge of facts, not their legal consequences, that causes the statute to start running. *See, e.g., United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979).

The analogy to this case is evident. Lo-Cascio certainly knew of the joint defense and of Gotti's control of counsel many years ago, but claims he didn't know until recently of Cardinale's flagrant deviation from his professional responsibility if the testimony we are told he would give is to be believed and the legal consequences of those known facts, namely, the claimed ineffective assistance of counsel, a claim which this Court also finds the record of the trial does not support.

The Court also found that Pollard failed to exercise due diligence in attempting to discover the facts. Consonant with the observation I made above about the failure of experienced counsel representing LoCascio through four post-conviction motions to discern Cardinale's ineffective assistance, the Court in Pollard made a similar observation. "Defendant's extensive legal representation undermines his theory that [he was] prevented from discovering those facts and exercising due diligence. Defendant's ... theory does not ring true when defendant was represented by multiple other lawyers. Given the many intervening years since the sentencing of defendant and his extensive legal assistance, the Court finds that the exercise of due diligence would have revealed the facts supporting the claims presented many years before ...." 161 F.Supp.2d at 12.

Turning to the petitioner's request previously noted, that this motion and all future proceedings be placed under seal to protect Cardinale from individuals who might attempt to harm him from coming forward with the information he is now revealing, that request is also denied. To begin with, it is difficult to imagine who those other individuals might be. His hearsay willingness to come forward is not embodied in any sworn statement by him, and no hint is given as to the identity of those individuals. Surely, LoCascio's family or friends would not attempt to harm him. Gottti is dead, and it is difficult to imagine why any current member of the Gambino Organized Crime Family, or relative of Gotti, would want to harm him.

■ Primary reliance for sealing is placed by the petitioner upon *United States v. Cojab,* 996 F.2d 1404 (2d Cir. 1993). *Cojab* provides no support for his request. After an historically-evolved discussion of the reasons for assuring openness of criminal proceedings, the Court held that "The presumption of openness is defeated only where the possible loss of that guarantee [of public and press access] is supported by carefully articulated findings demonstrating that (1) closure is necessary to safeguard defendant's right to a fair trial, and (2) the order directing closure is narrowly drawn so as to preserve that specific identifiable interest." 996 F.2d at 1408. There is no reason other than a vaguely asserted "fear for his welfare" which even remotely satisfies the first prong. It is also relevant to note that this motion and Cardinale's name were publicized on November 14, 2002, in Capeci's "Ganglandnews.com"; on January 22, 2003 in the New York Post in an article headed "Wiseguy Wants New Trial Over Gotti Threats"; and on January 23, 2003, in Cardinale's hometown newspaper, the Boston Herald, in an article headed "Gotti Threatened Hub Lawyer into Compliance." Sealing this motion, therefore, would no longer serve the purpose it ostensibly would seek to achieve and the request is denied.

The Clerk of Court is directed to unseal the records of this proceeding.

The proliferation of post-trial motions filed by Mr. LoCascio calls to mind the observation of Justice Harlan in *Mackey v. United States,* 401 U.S. 667, 691, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971), which is par-

ticularly apt. After noting the fundamental importance of finality in the criminal law, he wrote: "Surely it is an unpleasant task to strip a man of his freedom and subject him to institutional restraints. But this does not mean that in doing so, we should always be halting or tentative. No one, not criminal defendants, not the judicial system, not society as a whole is benefitted by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation on issues already resolved."

SO ORDERED.